FILED

2020 Aug-17  PM 04:20
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| LARRY COLEMAN, CHESTER COLEMAN, and FREDDIE SELTZER, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO.: 2:18-CV-00248-LSC |
| MORRIS-SHEA BRIDGE COMPANY and RICHARD J. SHEA, JR. | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants Morris-Shea Bridge Company, Inc. ("MSB") and Richard J. "Dick" Shea, Jr. ("Shea") (collectively, "Defendants") move this Court to enter summary judgment in their favor on all of Plaintiffs' claims.  There is no genuine issue of material fact and Defendants are entitled to a judgment as a matter of law. In support of this motion, Defendants rely upon the Undisputed Statement of Facts and brief herein and the documentary evidence included in its Evidentiary Submission in Support of Motion for Summary Judgment filed contemporaneously herewith.

## TABLE OF CONTENTS

INTRODUCTION ……………………………………………………..………… 1

STATEMENT OF UNDISPUTED FACTS ………………………………..………… 1

I.   MSB's History and Background …………………….…..……….. 1

II.  MSB's Workforce and Salary Structure ………………...……….. 4

III. Plaintiffs' Employment with MSB ………………….…….……... 7

      A. Larry Coleman ……………………………………………….. 8

      B. Chester Coleman ……………………………………….……… 10

      C. Freddie Seltzer ……………………………………….………..11

IV.  Plaintiffs' Separation of Employment with MSB …………..……….12

STANDARD OF REVIEW………………………………………….……………19

ARGUMENT AND AUTHORITIES ……………………………….……………….. 19

I.   Plaintiff Larry Coleman's Fair Labor Standards Act
     Claim Fails as Matter of Law ………………………….……….... 19

II.  Plaintiffs' Race Discrimination Claims Fail as a Matter of
     Law Because Plaintiffs' Cannot Establish a *Prima Facie* Case
     of Discrimination or Rebut Defendants' Non-Discriminatory
     Reasons for their Employment Decisions ………..……..…………….. 24

      A. Disparate Pay ……………………………………………….... 25

      B. Disparate Treatment in the Workplace ………………………… 30

      C. Termination ……………………………………….…………… 36

III.     Plaintiffs' Age Discrimination Claims Fail as a Matter of Law
         Because Plaintiffs' Cannot Establish a *Prima Facie Case* of
         Discrimination or Rebut Defendants' Non-Discriminatory
         Reasons for Their Employment Decisions ............................ 40

IV.      Chester Coleman's Backpay Damages, if any, Are Cut Off
         By MSB's Offer of Reinstatement ..................................... 43

V.       Larry Coleman and Freddie Seltzer Are Estopped From
         Claiming They Are Qualified for Their Positions Based on
         Their Representations to the Social Security Administration …….. 44

CONCLUSION …………………………..………………………………………… 45

## INTRODUCTION

Plaintiffs' Complaint, with five hundred paragraphs and twenty-two separate causes of action, is a "kitchen sink" approach. That may suffice at the motion to dismiss stage, but not at summary judgment. The undisputed facts do not support Plaintiffs' claims under any theory of discrimination, and summary judgment should be entered dismissing all of Plaintiffs' claims.

## STATEMENT OF UNDISPUTED FACTS

**I.     MSB's History and Background.**

1.      MSB is a leading deep foundations contractor working in heavy civil industrial and marine construction markets, throughout the United States and abroad.[1] *See* Declaration of Richard J. Shea, III ("R. Shea Dec."), **Exhibit A**, ¶ 3.

2.      Richard J. "Dick" Shea is the President of MSB. *See* Deposition of Richard "Dick" J. Shea, Jr. ("D. Shea Dep."), **Exhibit B**, p. 14:14-16.

3.      In terms of foundation piling work, MSB specializes in two primary distinct and separate types: (1) driven piles, where piling material is driven into the ground to a specified depth or to the point of "refusal" of the pile using a hydraulic hammer or similar tool, somewhat analogous to driving a nail with a handheld hammer; and (2) drilled piles, where a borehole is drilled into the ground and

---

[1] "Deep foundation" refers to a type of foundation that transfers building loads deeper into the ground to provide more stability for heavier structures.

reinforced concrete is filled into the borehole to form the pile.  Ex. A, R. Shea Dec.,
¶¶ 4-6; *see also* Deposition of Richard J. Shea, III ("R. Shea Dep."), **Exhibit C**, pp.
38:10-41:18 (describing pile-driven foundations as opposed to drilled foundations).

4.      Driven piles typically involve the use of a crane.  Ex. A, R. Shea Dec.,
¶ 9.  The crane will lift and "set" the pile in a template before it is driven, and a crane
will operate the hammer that is used to drive the pile into the ground.  *Id.*

5.      There are many companies that perform pile driving work.
Competition is intense and, as a result, profit margins are generally fairly low in the
pile driving side of MSB's business.  *Id.* at ¶ 5.

6.      For MSB's drilled piling projects, MSB uses a proprietary soil
displacement pile system, which involves a drilling operation to install soil
displacement piles.  *Id.* at ¶ 6. MSB uses drill rigs to auger into the soil using a
specialized tool.  *Id.*  The spoils are not brought to the surface but instead forced into
the sidewall of the pile, thus providing load bearing capacity through sidewall
friction in addition to tip or end bearing capacity.  *Id.*

7.      The technology, equipment, skills, tooling and craftsmanship for
installing drilled piles such as MSB's drilled DeWaal Piles are very different from
that required for the traditional driven pile system, and the construction techniques
are different from one another.  *Id.* at ¶ 7.  As a result, many of MSB's field crews
specialize in driven piles (pile driving) or in drilled piles, but not both.  *Id.*

8.     Around 2010, OSHA enacted regulations requiring that crane operators be licensed by an accredited organization.  *Id.* at ¶ 9.  The two most widely known accrediting organizations are the National Commission for the Certification of Crane Operators ("NCCCO") and Crane Institute Certification ("CIC").  *Id.* at ¶ 9.

9.     The OSHA requirement's effective date was delayed to 2018.  *Id.* at ¶ 9.  Nonetheless, beginning around 2010, most of MSB's customers began requiring that all crane operators have NCCCO or CIC licenses.  *Id.*; *see also* Ex. C, R. Shea Dep., pp. 51:21-52:2; 53:3-54:3.

10.    As a result, MSB employees who had operated cranes doing pile driving but who did not have an NCCCO or CIC accreditation had fewer and fewer opportunities to work as a crane operator.  Ex. A, R. Shea Dec., ¶ 9.

11.    In addition, those employees who had NCCCO or CIC accreditation had more desirable job qualifications and typically commanded higher wages than those who did not have that accreditation.  *Id.*

12.    Cranes are not generally used in MSB's drilling operations or DeWaal Pile System.  *Id.* at ¶ 10.  Rather, MSB uses drill rigs.  *Id.* These drill rigs are classified as "excavators," not "cranes," by OSHA.  *Id.*; *see also* Ex. C, R. Shea Dep., p. 50:21-23 ("[A]ll of our drill rigs are classified by OSHA as excavators.").

13.    As a result, NCCCO and CIC licensing requirements are not applicable to drill rigs.  Ex. A, R. Shea Dec., ¶ 10; Ex. C, R. Shea Dep., pp. 50:21-51:2.

14.     Nonetheless, drill rigs are expensive, complex, and highly sophisticated pieces of equipment.  Ex. A, R. Shea Dec., ¶ 11.  MSB's drill rigs typically cost $5 million or more apiece.  *Id.*  Drill rigs are not used for pile driving.  *Id.*

15.     Operating a crane and operating a drill rig are two separate and distinct skill sets.  *Id.* at ¶ 12; Ex. C, R. Shea Dep., p. 56:7-9 (crane operator and excavator operator are "[t]wo different trades").  Being qualified on one does not qualify that individual to operate the other.  Ex. A, R. Shea Dec., ¶ 12.

16.     Drilling projects are "more complex" than pile-driving projects, and more demanding for supervisors than a pile driving job.  Ex. C, R. Shea Dep., pp. 101:6-14; 104:11-14; 106:3-22.

17.     As a result, generally speaking, drilling employees are paid more than pile driving employees.  Ex. A, R. Shea Dec., ¶ 14; Ex. C, R. Shea Dep., p. 101:6-14 ("A pile-driving superintendent would not make … as much as a drilling superintendent, because the drilling jobs are much more complex."); *id.* at 186:17-187:13 (drill rig operators are "in very high demand," and consequently may be guaranteed 40 hours a week whether they work that many hours or not).

## II.     MSB's Workforce and Salary Structure.

18.     As is common in the construction industry, MSB's workforce fluctuates depending on the number of projects at a given time, with approximately 500

employees on the high end and 150 employees on the low end when business slows. Ex. B, D. Shea Dep., pp. 26:14-27:6.

19.     MSB divides its employees into various "crafts" (i.e., laborer, crane and drill operator, etc.), with classification levels based on skill level and years of experience; classification Level I is the highest and Level III the lowest. MSB Orientation Policy, **Exhibit D**, at MSB 0015-26; Ex. C, R. Shea Dep., p. 60:5-8.

20.     While classification levels impact an employee's rate of pay, other factors, including the type of project (drilling vs. pile driving), are also relevant.  Ex. C, R. Shea Dep., pp. 101:6-9; 104:11-14.

21.     Hiring decisions for supervisory positions, like foreman and superintendent, are generally made by Dick Shea or Richard, Steve, or Bill Shea.[2] Ex. C, R. Shea Dep., pp. 250:20-251:16.  Hourly positions, on the other hand, are often filled by the supervisors on the job (*i.e.*, superintendent or foreman).  *Id.*; Ex. B, D. Shea Dep., p. 377:1-7 ("[E]ach foreman generally hires his own guys.").

22.     In addition, supervisors make suggestions with respect to pay decisions for their crew.  Ex. B, D. Shea Dep., pp. 379:8-380:17 (foremen and superintendents can "suggest a pay raise or demotion or whatever" for their crew).

---

[2] Richard, Steve, and William "Bill" Shea are Dick Shea's three sons and the Vice Presidents of MSB.  Ex. B, D. Shea Dep., pp. 15:10-16:18.

23.     Supervisory positions, such as foreman and superintendent, are generally paid salary.  Ex. C, R. Shea Dep., p. 115:5-16 ("Q: So superintendent and foreman are both salaried? A: Yes ….").

24.     Salaried employees, like hourly employees, have a base rate of pay based on the particular employee's skill level, years of experience, and type of project (i.e., pile-driving vs. drilling.); *id.* at pp. 115:17-116:16 ("Not every [foreman is] going to be at that rate because some of them have more ability than others …. more experience than others."); *see also* Ex. D, Orientation Policy, Section 5.[3]

25.     In addition to salary and hourly wages, MSB also pays "per diem" on certain out-of-town projects.  Ex. D, Orientation Policy, Section 5.

26.     Like rate of pay, per diem "fluctuates by area" and other factors like the cost of living and time of year.  Ex. C, R. Shea Dep., pp. 67:14-68:18.  Other factors like employee position and distance of travel required also may affect per diem rates. *Id.*; *see also* May 28, 2020 Deposition of Lee Dubberly ("Dubberly Dep. II"), **Exhibit E**, pp. 200:17-201:2 (per diem rate is "based on your job function").

27.     MSB's normal hours are 7:00 a.m. to 5:30 p.m., Monday through Friday, with thirty minutes for lunch. Ex. D, Orientation Policy, at MSB 0008.

---

[3] The Orientation Policy has not been updated since 2011, and thus, the wage scale is not up to date.  *See* Ex. C, R. Shea Dep., pp. 68:19-69:14.

28.     Hourly employees required to work overtime in excess of forty hours a week or on scheduled holidays are paid at one and one-half times the employee's normal hourly rate of pay.  *Id.* at MSB 0008.

29.     Salary positions are paid at the employee's base rate of pay each week plus an additional eight hours at their calculated hourly rate anytime the employee works on a Saturday or Sunday.  Ex. B, D. Shea Dep., pp. 240:14-16; 427:18-428:2; 503:8-18.

## III.    Plaintiffs' Employment With MSB.

30.     Plaintiffs are three African American brothers, Larry Coleman ("Larry") Chester Coleman ("Chester"), and Freddie Seltzer ("Freddie"), who each worked for MSB, on and off, over a period extending over 25 years until their final separation from employment with MSB in April 2017.[4]  *See* Pls' Employee Files, collectively attached as **Exhibit F**.

31.     At the time of their separation, Larry was 59 years old (*id.* at MSB 0489); Chester was 55 (*id.* at MSB 0157); and Freddie was 52 (*id.* at MSB 0961).

---

[4] The Parties dispute whether Plaintiffs were terminated or laid off but for purposes of summary judgment, it is sufficient to note that Plaintiffs separated from employment with MSB in April 2017 and were not rehired.

A.   **Larry Coleman**.

32.   Larry Coleman was first hired by MSB in 1980 and worked in various positions, on and off, ranging from laborer to pile-driving foreman until 2014,[5] when he quit MSB without notice and joined a competitor, Berkel.  Deposition of Larry Coleman ("L. Coleman Dep."), **Exhibit G**, pp. 40:9-20; 57:6-8; 310:16-20; Ex. C, R. Shea Dep., 368:1-369:14.

33.   After several months with Berkel, Larry filed a job application with MSB seeking a "Superintendent" position.  Ex. F, at MSB 0484.

34.   Larry was rehired by Dick Shea in September 2014 as a pile-driving foreman, a salaried position with a rate of pay of $35/hour.  *Id.* at MSB 0483, 0496; L. Coleman Dep., pp. 311:5-312:16 (Dick Shea rehired him in 2014).[6]

35.   As a salaried foreman, Larry was paid $1,400 per week, plus an additional $35/hr for eight hours whenever he worked on Saturday or Sunday.  Ex.

---

[5] In the late 1990s, while working on a project in Bowater, Tennessee, Larry was briefly promoted by Dick Shea to superintendent after Lee Dubberly was called to another job. Ex. G, L. Coleman Dep., pp. 66:18-67:12.  As Larry explained, if a superintendent was called to another job, the foreman on the job was designated as the superintendent to finish it out.  *Id.* at 68:7-19.

[6] Larry testified that his rehire position was "Superintendent/Foreman," which is belied by his Employee File.  *See* Ex. F, at MSB 483 (position listed as "Foreman").  In any event, this is a distinction without a difference because Larry testified that as a "Superintendent/Foreman," his duties were to run the crew and answer to the head superintendent on the job, typically Lee Dubberly.  Ex. G, L. Coleman Dep., pp. 83:15-23; 223:8-224:2; 342:9-17.  In other words, regardless of nomenclature, his duties were those of a foreman.  Ex. B, D. Shea Dep., p. 123:8-124:9 (Larry was a "foreman," whose job was to "oversee the crew that was doing the work").

F, at MSB 00483, 00496; Ex. G, L. Coleman Dep., pp. 346:19-347:14 (MSB paid salaried employees when they worked on a Saturday or Sunday).

36.     Larry described his role as a foreman as a "management position," in which he was responsible for "run[ning] a crew" of approximately seven men.  Ex. G, L. Coleman Dep., pp. 41:4-18; July 11, 2019 Deposition of Lee Dubberly ("Dubberly Dep. I"), **Exhibit H**, p. 35:13-15 (foreman is "considered a supervisor").

37.     His duties included "giv[ing] out work assignment[s], mak[ing] sure that [the crew] did what they was (sic) assigned to do."  Ex. G, L. Coleman Dep., p. 41:9-13; Ex. B, D. Shea Dep., pp. 123:8-124:9 ("His job was to oversee the crew that was doing the work" and "direct[] the work of four or five guys that were working."); *id.* at 397:16-398:6 (describing the foreman's role as "directly manag[ing], while he was working, this crew of men," and making sure that the crew was "doing their work safely … and properly.").

38.     He also was responsible for documenting and turning in his crew's time, Ex. B, D. Shea Dep., p. 125:20-21, and reported to the head superintendent on the job, who reported directly to Dick Shea.  Ex. G, L. Coleman Dep., p. 83:15-22.

39.     Over his years of employment, Larry never asked Dubberly, Dick Shea, or anyone else at MSB for a promotion or "additional training," and instead MSB "just elevated [him]" at various times.  Ex. G, L. Coleman Dep., pp. 352:21-353:23.

**B.**   **Chester Coleman**.

40.   Chester Coleman was hired in 1992 and worked for MSB on and off through his final separation in April 2017.   Deposition of Chester Coleman ("C. Coleman Dep."), **Exhibit I**, p. 15:10-14.

41.   Chester's most recent position was as a pile driving crane operator, an hourly position with a rate of pay of $25/hr.   *Id.* at pp. 18:2-4; 47:15-17.

42.   Chester was neither NCCCO- nor CIC-licensed, *Id.* at p. 21:2-4, which limited the jobs upon which he was able to work.   Ex. A, R. Shea Dec., ¶ 9; Ex. C, R. Shea Dep., pp. 53:17-54:3 ("[A]ny of the major companies … require that if you have a crane, it has to be a licensed crane operator, and it has to be an NCCCO.").

43.   Chester also was not qualified to operate a drill rig despite MSB's efforts to train him.   Chester testified that MSB "wanted [him] to learn how" to drive a drill rig and gave him the opportunity in 2007; however, he damaged the mast of the rig, which cost MSB over $100,000 to replace.   Ex. I, C. Coleman Dep., pp. 26:3-27:9; Deposition of Shane Moore ("Moore Dep."), **Exhibit J**, pp. 147:4-148:7.

44.   In 2012, Shane Moore tried again to train and qualify Chester to operate a drill rig, but Chester failed the certification exam. Ex. J, Moore Dep., pp. 148:8-149:13; Equipment Operator Practical Examination Form, **Exhibit K**, at MSB 2728.

45.     Chester testified that when he started operating a crane, he asked for a raise and received it.  Ex. I, C. Coleman Dep., p. 47:5-11.  When asked whether he requested any other raises at MSB, Chester responded, "No."  *Id.* at 47:12-14.

46.     The only position above operator, in Chester's view, was superintendent, and Chester confirmed that he never "asked for that" or any other promotions or additional training during his employment.  *Id.* at 47:2-4; 47:18-48:3.

47.     Over his years of employment, MSB accommodated Chester on multiple occasions.  Between September 2008 and January 2009, Chester was paid his normal rate of pay during extended periods of leave while his wife was sick.  *Id.* at pp. 30:13-31:10. In 2014 when Chester was diagnosed with cancer and unable to work, MSB kept him on the payroll and maintained his medical insurance throughout his entire one-year absence.  *Id.* at pp. 28:6-29:13. Chester admitted that "[Shea] helped me.  I can't deny that."  *Id.* at 29:23-30:12.

**C.     Freddie Seltzer**.

48.     Freddie Seltzer was hired in 1989 and worked for MSB on and off through his separation in April 2017.  Deposition of Freddie Seltzer ("Seltzer Dep."), **Exhibit L**, p. 25:5-8.

49.     Freddie's most recent position was as a welder on pile driving jobs, an hourly position with a rate of pay of $20.50.  Ex. F, at MSB 0725.

50.     Freddie testified that over the years with MSB, he got several raises. Ex. L, Seltzer Dep., p. 57:5-19 ("[E]very so often I get a raise like anybody else.").

51.     Freddie testified that at one point he wanted to be promoted to foreman, but the only person at MSB he told was his brother, Larry Coleman, who promised he would help but never "follow[ed] through." *Id.* at pp. 88:9-89:14. Freddie confirmed that there were no jobs at MSB that he was denied, and no tests or training that he wanted to take but was not given the opportunity. *Id.* at 89:15-90:6.

**IV.     Plaintiffs' Separation of Employment with MSB.**

52.     The last major customer paying job for which the Plaintiffs worked was job number 1271 at the Tampa Electric Company ("TECO") facility in Florida, which concluded in April 2016. *See* Pls' Ledger Card Reports, **Exhibit M**, at MSB 005079-5085 (Larry); MSB 005147-5154 (Freddie); MSB 005287-5294 (Chester).

53.     On the TECO project, Plaintiffs each received their regular rate of pay, *id.*, and a per diem of $75 to $85 for Larry; $60 to $85 for Chester; and $50 to $70 for Freddie. 1271 EE Per Diem, **Exhibit N**.[7]

54.     Dubberly and Sam Gardner, both white superintendents, received a $75 to $85 per diem throughout the TECO Project, while the remaining crew members made between $50 to $75. *See id.*

---

[7] During the snowbird season in Florida, Plaintiffs' superintendent Lee Dubberly negotiated a higher per diem for his work crew, including Plaintiffs, which is why their per diems increased. *See* Declaration of Lee Dubberly ("Dubberly Dec."), **Exhibit O**, MSB 1561, at ¶ 3.

55.     Following the conclusion of the TECO Project in April 2016, Plaintiffs were assigned to a special project at Mountain Lake Farms (the "Mountain Lake Farms Project"), and in April 2017, Plaintiffs were assigned to a special project at Richard Shea's residence (the "Shea Residence Project").[8]  Ex. M, at MSB 005094-5100 (Larry); MSB 05160-5166 (Freddie); MSB 05304-5309 (Chester).

56.     Both of these projects were classified as "non-equipment" projects that could have been performed by day laborers for $10.00 to $15.00 per hour.  *See id.* (classifying Job No. 7999 as "Non-Equipment"); *see also* Ex. B, D. Shea Dep., pp. 87:8-89:1 ("[Plaintiffs'] level of pay was not cut to labor [at the Mountain Lake or Shea Residence Projects], which is all we really needed out there … it was just laborer's work we were doing."); Ex. C, R. Shea Dep., p. 205:3-16 ("It was just laborer's work … dragging tree limbs and stuff to the chipper or things like that.").

57.     However, in an effort to keep some of its long-time employees gainfully employed, MSB chose to use workers like Plaintiffs and continued their usual rate of pay.  Ex. B, D. Shea Dep., at 88:18-89:1 ("[R]ather than let [Plaintiffs] be at home and have some of our lower-skilled laborers that we laid off out there working, … I would always use guys that worked for us that I didn't want to lay off ..."); Ex. C,

---

[8] "Special projects" were not regular revenue producing work, but projects to keep certain employees working rather than being laid off between revenue producing projects. *See* Ex. C, R. Shea Dep., p. 191:5-8; *id.* at 194:19-22; *see also* Ex. B, D. Shea Dep., pp. 113:23-114:12; Ex. G, L. Coleman Dep. p. 155:1-7.

R. Shea Dep., p. 205:13-16 ("They didn't have a paying job for the company to go to, so we kept them busy at my house … [and] at the lake before that.").

58.     For both of these projects, Larry received $35/hr; Chester received $25/hr; and Freddie received $20.50/hr.  Ex. M, at MSB 005094-5100 (Larry); MSB 05304-5309 (Chester); MSB 05160-5166 (Freddie).

59.     Because both of these projects were local, meaning the employees returned home each evening, MSB was not obligated to pay a per diem; however, MSB provided a per diem of $75 for Larry and Chester and $65 for Freddie. Declaration of Jimmy Harris ("Harris Dec."), **Exhibit P**, MSB 1852, at ¶ 5; Ex. O, Dubberly Dec., MSB 1562, at ¶ 5; Ex. E, Dubberly Dep. II, p. 200:6-9 (MSB paid per diem on these projects as a "supplement … just trying to help them").

60.     In addition, Dick Shea let Plaintiffs fish on the Property after work during the Mountain Lake Farms Project.  Ex. L, Seltzer Dep., pp. 110:9-112:7.

61.     During these projects, Plaintiffs' supervisors, including Shea and Jimmy Harris, perceived a decline in Plaintiffs' work ethic and performance.  Ex. B, D. Shea Dep., pp. 100:1-20; 101:20-102:4; Deposition of Jimmy Harris ("Harris Dep."), **Exhibit Q**, pp. 57:4-58:9; Ex. P, Harris Dec., MSB 1852, at ¶ 6.

62.     According to Shea, he had observed Plaintiffs coming "late to work, … not working diligently, … and … taking too long for lunch" at both the Mountain

Lake Project and the Shea Residence Project.  Ex. B, D. Shea Dep., pp. 100:13-20; 101:20-102:4.  In Shea's opinion, "they weren't doing their job."  *Id.* at 97:19-21.

63.     Jimmy Harris, a superintendent who worked with Plaintiffs at both projects, also observed Plaintiffs take excessively long lunch breaks and specifically recalled telling Larry to tighten up on the thirty-minute lunch policy while at the Shea Residence Project.  Ex. Q, Harris Dep., pp. 57:4-58:9.

64.     On April 10, 2017, Plaintiffs were working as part of a small crew at a at Richard Shea's residence, along with Dick Shea and superintendents Lee Dubberly and Jimmy Harris, clearing rocks, stumps, sticks, and other debris from the topsoil around the property.  Ex. B, D. Shea Dep., pp. 561:18-562:7.

65.     Shea was operating a backhoe while Dubberly was operating a dozer. *Id.* at p. 561:20-21.

66.     When the crew broke for a thirty-minute lunch, Chester and Freddie drove to a convenience store to pick up lunch.  Ex. L, Seltzer Dep., pp.121:20-122:9.

67.     The Parties dispute whether Chester and Freddie were late returning from lunch, but Freddie testified that upon their return, Larry approached and asked whether they were "going to take all day" and told them that Shea was "down the hill mad."  *Id.* at p. 131:9-21.  Freddie said he later learned from Larry that Shea "said [they were] late for coming back from lunch."  *Id.* at 134:9-13.  Chester also testified that he understood Shea sent them home because "he got it in his head – I

guess he was complaining about we were taking a long lunch break." Ex. I, C. Coleman Dep., p. 70:14-18. When asked why he believed that, Chester responded, "Because when I got back, that's what Larry said. He said that he [Shea] asked where we was …." *Id.* at 71:2-6.

68.    Larry testified that when Freddie and Chester returned from the convenience store, "they didn't get out [of the truck] exactly when they drove up," and Shea asked, "[H]ow long they taking for lunch?" Ex. G, L. Coleman Dep., p. 180:10-16. Larry did not think Freddie and Chester took too long for lunch but acknowledged that Shea "thought that they took more than 30 minutes." *Id.*

69.    Larry then told Chester and Freddie they needed to go home, and when they asked why, Larry responded, "I think I believe that Dick Shea thought they took too long for lunch." *Id.* at p. 182:9-21. Because Larry rode with Chester and Freddie, all three Plaintiffs left the job site. *Id.* at 183:1.

70.    According to Shea, he did not intend to terminate Plaintiffs.

> When I told Jimmy Harris to send them home, … that was meant for them to go home, think about what they're doing. And then generally, they would call and say, hey, we want to come back to work, and we'd have a discussion, they'd come back to work. That … was the way that I operated, you know, from the beginning right through this time. If they don't want to work, fine, go home, not going to argue with them.

Ex. B, D. Shea Dep., p. 161:1-12.

71.    Larry returned to the job site the next day, and Shea instructed Harris to send him home. *Id.* at 162:17-23.

72.     MSB transferred three current employees to replace Plaintiffs: Sam Gardner, a 54-year-old white superintendent; Larry Young, a 46-year-old African American foreman; and Tony Dennis, a 44-year-old white foreman.  Ex. P, Harris Decl., ¶ 10.

73.     The following Monday, April 17, 2017, Dubberly submitted timesheets for the crew at the Shea Residence Project, including a timesheet for Larry, Chester and Freddie, and MSB paid Plaintiffs for all of the hours submitted.  *See* Declaration of Linda Catlin ("Catlin Decl."), **Exhibit R**, MSB 1854-1855 at ¶¶ 3-4.

74.     Larry's timesheet reflected eight (8) hours of work for both Monday, April 10, 2017, and Tuesday, April 11, 2017.  *Id.* at ¶ 4.  Chester and Freddie's timesheets each reflected six (6) hours of work for Monday, April 10, 2017.  *Id.*

75.     Linda Catlin in Payroll asked Dubberly the employment status of Plaintiffs, and Dubberly told her that Shea had sent them home but that he did not know whether they were fired or laid off.  *Id.* at ¶ 3.

76.     Dubberly did not complete Payroll Change Notices ("PCNs") for Plaintiffs, as is MSB's employment policy.  *Id.*  Instead, on April 18, 2017, Chris Hughes, another MSB supervisor, informed Catlin he believed that Plaintiffs were fired, and Catlin completed a PCN for Plaintiffs reflecting their termination.  *Id.* at ¶ 5.

77.     On May 11, 2017, Dubberly called Chester about a pile-driving job for Alabama Power Company at its steam plant in Wilsonville, Alabama, but Chester declined the offer.[9]  Ex. E, L. Dubberly Dep. II, pp. 37:12-38:12.

78.     Chester testified Dubberly called him and "asked [him] if [he] was available to go to work," but he declined.  Ex. I, C. Coleman Dep., pp. 54:14-55:6.

79.     After their separation from employment with MSB, Larry and Freddie both applied for disability with the Social Security Administration and are receiving benefits.  Ex. G, L. Coleman Dep., pp. 194:13-195:4; Ex. L, Seltzer Dep., p. 156: 21-23.  Based on Freddie's application and representations to the SSA, he was determined disabled "as of March 30, 2017." *See* Social Security Administration Notice of Decision, attached as **Exhibit S**.[10]   Plaintiffs also applied for unemployment compensation with the State of Alabama Department of Labor.  *See* Pls' Department of Labor Records, **Exhibit T**.  Larry and Chester both cited "lack of work" as the reason they were unemployed.  *Id.* at L. Coleman ALDOL  000025 and C. Coleman ALDOL 000026.

---

[9] The Parties dispute whether Dubberly also asked Chester about Larry and Freddie's availability for the Wilsonville Plant job.  In any event, both Larry and Freddie applied for and are receiving disability benefits.  *See* SOF ¶ 79.

[10] Defendants issued a subpoena to the SSA for Larry Coleman's records on October 31, 2019, and issued a subpoena for Freddie's records on March 17, 2020.  Defendants have been diligently pursuing Plaintiffs' complete records since then, including filing a motion to compel the SSA to comply.  Upon receipt of complete records, Defendants will supplement this Motion, if necessary.

80.     Freddie represented that he was terminated for "violation of company policy."  *Id.* at Seltzer ALDOL 000032.  In response to an inquiry regarding the "name and title of person who discharged you," Freddie identified "Jimmy Harris and Larry Co.," the later appearing to be a reference to his brother and foreman on the Shea Residence Project, Larry Coleman.  *See id.* Seltzer ALDOL 00033.

## STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In opposing summary judgment, the non-moving party may not rely on the pleadings but must show evidence that material facts exist demonstrating a genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor."  *Chapman v. A1 Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*).

As set forth more fully below, there is no genuine issue of material fact and Defendants are entitled to judgment as a matter of law on all of Plaintiffs' claims.

## ARGUMENT AND AUTHORITIES

I.      **Plaintiff Larry Coleman's Fair Labor Standards Act Claim Fails as a Matter of Law.**

The Fair Labor Standards Act, 29 U.S.C. § 207 *et seq.* ("FLSA") governs overtime requirements for employees covered under the Act.  Covered employees

must be paid time and one-half for hours worked in excess of forty in a given workweek. *Id.* § 207(a)(1). However, the FLSA exempts from the overtime requirement persons "employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1). The employer bears the burden to establish that it is entitled to an exemption. *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008).

An employee is properly classified as a bona fide executive, and therefore exempt from the overtime requirements, if: (1) he is "[c]ompensated on a salary basis at a rate of not less than $455 per week"; (2) his "primary duty is management of the enterprise in which [he] is employed or of a customarily recognized department or subdivision thereof"; (3) he "customarily and regularly directs the work of two or more other employees"; and (4) he "has the authority to hire or fire other employees," or his "suggestions and recommendations as to the hiring, firing, advancement, promotion[,] or any other change of status of other employees are given particular weight." *See Watkins v. City of Montgomery*, 919 F. Supp. 2d 1254, 1259-60 (M.D. Ala. 2013) (quoting 29 C.F.R. § 541.100).[11]

The undisputed evidence establishes that Larry Coleman was an executive for purposes of the FLSA and is therefore exempt from the overtime requirements.

---

[11] In January 2020, the FLSA's salary threshold was increased to $648 per week, but during the relevant time period, it was $455 per week. In any event, Larry Coleman's salary exceeded the CFR's minimum requirements under either amount.

*First,* during the relevant time period,[12] Larry was employed by MSB as a foreman for which he was compensated on a $1,400/week salary ($35/hr for forty hours), well in excess of the $455 per week minimum set out in the CFR.  SOF, ¶ 35.[13]  This first factor is easily satisfied.

*Second*, Larry's "primary duty" as a foreman was the management and supervision of a work crew.  The CFR defines "primary duty" to mean the "principal, main, major or most important duty that the employee performs."  29 C.F.R. § 541.700(a).  This determination "must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  *Id.* Relevant factors include (1) the relative importance of the management duties as compared with other types of duties; (2) the amount of time spent performing management duties; (3) the employee's relative freedom from direct supervision; (4) and the relationship between the employee's salary and the wages paid to other employees for the kind of non-management work performed by the employee.  *Id.*

---

[12] Claims under the FLSA are subject to a two-year statute of limitations, except in cases involving a willful violation of the Act, for which a three-year statute of limitations applies.  *See* 29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  Defendants dispute that MSB violated the FLSA at all or that any conduct on its part was willful; however, for purposes of this motion, Defendants will assume that the three-year statute of limitations applies, and, accordingly, Larry's claims for violations of the FLSA preceding February 14, 2015, at the very earliest, are barred by the statute of limitations.

[13] The Undisputed Statement of Facts is cited herein as "SOF."

In his deposition, Larry agreed that a foreman is a "management position," and testified that he was responsible for "run[ning] a crew" of approximately seven men.  SOF, ¶ 36.  His duties included "giv[ing] out work assignment[s], mak[ing] sure that [the crew] did what they was (sic) assigned to do."  SOF, ¶ 37.  He was responsible for documenting and turning in his crew's time on a job, and he reported to the head superintendent on the job, who reported directly to Dick Shea, the President of the Company.  SOF, ¶ 38.

While Larry also performed "non-executive" tasks such as working alongside his crew, the regulations provide that "[c]oncurrent performance of exempt and nonexempt work does not disqualify an employee from the executive exemption." 29 C.F.R. § 541.106(a).  For example, an assistant restaurant manager may perform work such as serving customers, cooking food, and stocking shelves but does not lose his exemption if his "primary duty" is management of the establishment.  *Id.*

Similarly, Larry could permissibly work along with his crew without losing his exempt status because his "primary duty" as foreman was supervision and management of his crew.[14]  SOF, ¶ 37 (describing the foreman's role as "directly manag[ing], while he was working, this crew of men," and making sure that the crew was "doing their work safely … and properly."); *see Diaz v. Team Oney, Inc.*, 291

---

[14] Larry also testified that working alongside his crew was "a personal choice" he made to "make sure that my work was done and done right and on time."  L. Coleman Dep., p. 109:4-14.

F. App'x 947, 949 (11th Cir. 2008) (restaurant manager's "primary duty" was management of restaurant despite that performing non-managerial tasks like making and cutting pizza, greeting customers, and cleaning the store where his managerial duties, including supervising lower employees, apportioning work, and filling out required paperwork, were "significantly more important" to the operation).

*Third*, as noted above, in his role as foreman, Larry customarily and regularly directed the work of a crew of approximately five to seven men.   SOF, ¶ 36.

*Fourth*, and in addition, as part of the supervisor's duties, superintendents and foremen are generally given discretion to "hire their own guys," *i.e.*, the work crew, and make suggestions with respect to pay decisions for their crew.  SOF, ¶¶ 21-22. As a foreman, Larry could make suggestions with respect to the hiring, firing, pay raise, and change in employment status for his crew.  *Id.*

In short, the undisputed evidence establishes that Larry was properly classified as an executive for purposes of the FLSA.[15]  Accordingly, Defendants are entitled to summary judgment on Larry's FLSA claim in Count One.

---

[15] Indeed, when asked whether he believed he was appropriately classified as salaried, Larry testified, "Yeah.  Because all the – all the superintendents that [MSB] had was on a salary." L. Coleman Dep., p. 345:15-21.  He agreed that being a salaried employee "sometimes" had its "advantages," because construction work is weather sensitive, *i.e.*, dependent on the weather, and that as a salaried employee, he was paid his full weekly salary even if weather prevented his crew from working (whereas hourly employees on his crew would not be paid).  *Id.* at 90:9-91:15. Further, although he was salaried and exempt from the overtime requirements, during the relevant time period MSB paid Larry—like all other salaried employees—at his full rate of pay for eight hours whenever he worked on a Saturday or Sunday.  *Id.* at 94:4-16; 346:19-346:14.  Thus, to the extent that he was improperly classified as exempt, there is no evidence of any damages.

## II.   Plaintiffs' Race Discrimination Claims Fail as a Matter of Law Because Plaintiffs Cannot Establish a *Prima Facie* Case of Discrimination or Rebut Defendants' Non-Discriminatory Reasons for Their Employment Decisions.

In Counts Two through Nineteen, Plaintiffs bring various claims for racial discrimination pursuant to Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981.  In order to prove such a claim, a plaintiff must produce direct evidence of discrimination or satisfy the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Brooks v. Cty Com'n of Jefferson Cty*, 446 F.3d 1160, 1162 (11th Cir. 2006).

Plaintiffs' race discrimination claims are premised upon allegations that Plaintiffs (1) were compensated less than similarly situated white employees (Counts 2-7); (2) suffered disparate treatment in the workplace and were subjected to a hostile work environment (Counts 8-13); and (3) were terminated based on their race (Counts 14-19).  As discussed below, Defendants are entitled to summary judgment under any of these theories because Plaintiffs cannot establish a *prima facie* case of discrimination, and because Defendants acted only for legitimate, non-discriminatory reasons, which Plaintiffs cannot rebut.

Because Plaintiffs have no direct evidence of race discrimination, Plaintiffs must satisfy the *McDonnell Douglas* framework to survive summary judgment. Under *McDonnell Douglas*, a plaintiff must show that (1) he belongs to a racial minority or another protected class, (2) he was qualified to perform his job or, with

regard to promotions, applied for and was qualified for a promotion, (3) he was subjected to an adverse employment action by defendants or was rejected for promotion despite being qualified, and (4) defendants treated similarly situated employees outside his racial or protected class more favorably or promoted equally or less-qualified employees outside of his protected class. *Brown v. Ala. Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010) (citation omitted).[16]

If a plaintiff meets this initial burden, "the burden then shifts to the employer to produce evidence that its action was taken for a legitimate, non-discriminatory reason." *Brooks*, 446 F.3d at 1162 (citation omitted).  After the employer meets its burden of production, the inquiry "'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Id*.  Although the burdens shift back and forth, "the ultimate burden of persuading the trier of fact that the employer intentionally discriminated against the employee remains at all times with the plaintiff." *Id.*

## A.    Disparate Pay.

In Counts Two through Seven, Plaintiffs allege that they were paid less than similarly situated white employees.  The Eleventh Circuit has recently reiterated that

---

[16] For purposes of summary judgment, Defendants do not dispute that Plaintiffs have established the first and third elements of a *prima facie* case.  They are African Americans and ostensibly suffered an adverse employment action by being sent home by Shea.  As discussed in Section V, *infra*, however, to the extent that Larry and Freddie have represented to the Social Security Administration that they are totally disabled, they are estopped from claiming they were qualified for their positions.

"a meaningful comparator analysis must be conducted at the *prima facie* stage of the *McDonnell Douglas*'s burden-shifting framework." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1216 (11th Cir. 2019). Thus, to proceed beyond the first stage of the *McDonnel Douglas* framework, a plaintiff must prove "that [he] was treated less favorably than 'similarly situated' individuals outside of [his] class." *Id.*

In *Lewis*, the Eleventh Circuit, sitting *en banc*, held that the proper standard for determining "similarly situated" comparators under *McDonnell Douglas* is "similarly situated **in all material respects**." *Id.* at 1226 (emphasis added). This analysis does not turn on "formal labels" but on "substantive likeness." *Id.* at 1227. A valid similarly situated comparator typically "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy, guideline, or rule as the plaintiff"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff"; and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227-28.

In this case, the "similarly situated" comparator analysis is where Plaintiffs' disparate pay claims start and end. Despite two years of discovery, Plaintiffs have not identified any valid "similarly situated" employees who were treated more favorably. Instead, Plaintiffs attempt to compare themselves indiscriminately to any other MSB employee with a similar title, without regard to specifics like the type of

project (i.e., pile driving vs. drilling), location of the project, skill level, licensure, experience, or the superintendent for whom the supposed comparators worked.

For example, with respect to Larry, Plaintiffs proffered a list of thirteen foreman purportedly "similarly situated" to Larry.  However, Larry is the <u>only</u> foreman on the list who worked exclusively as a pile-driving foreman, with all of the others either being a drill foreman, or one who worked both as a drill *and* pile-driving foreman, or not a foreman at all.  *See* Declaration of Shane Moore ("Moore Dec."), **Exhibit U**, ¶¶ 2-4.  None are "similarly situated" to Larry.  *See Lewis*, 918 F.3d 1227-28 (valid comparator will "share the plaintiff's employment … history").

Likewise, Plaintiffs' proffered list of operators purportedly similarly situated to Chester fails to identify a single valid comparator.  Only six operators (including Chester) out of the 16 listed are crane operators (rather than drill rig operators), meaning the remaining 10 are not similarly situated to Chester.  Ex. U, Moore Dec., at ¶¶ 7-8.  And of the five remaining purported comparators, Chester is the <u>only one</u> that is not NCCCO- or CIC-licensed.  *Id.*  Accordingly, none of Plaintiffs' purported comparators are similarly situated to Chester.  *See Lewis*, 918 F.3d 1227-28.

For Freddie, Plaintiffs have failed to identify *any* similarly situated comparators whom they claim were treated more favorably.[17]  As noted above, it is Plaintiffs' burden, as part of their *prima facie* case, to prove that they were treated

---

[17] Ex. A, R. Shea Dec., ¶¶ 19-22 (Freddie was not paid less than comparable employees).

less favorably than similarly situated employees outside of their protected class, *see Lewis*, 918 F.3d at 1216, and thus, Plaintiffs' failure to do so is fatal to their claims.

In any event, the undisputed evidence establishes that Plaintiffs' rates of pay fell well within the normal range.  Even on Plaintiffs' purported comparator lists—which are not valid comparators at all—Plaintiffs' rates of pay do not fall outside of the norm.  On the Foreman list, rates of pay range from $26 to $60, with Larry's rate of $35 falling within that range.  Ex. V, Moore Dec., at its Ex. A.  Chester's rate of $25 likewise, falls at the exact midpoint of the Operators list, with the highest rate of pay being $32 and the lowest being $18, even though Chester was the only crane operator without an NCCCO or CIC license.  *Id.* at its Ex. B.

And when valid comparators are considered, it becomes clear that Plaintiffs were treated equal to—if not better—than similarly situated employees.  For example, MSB employed three pile-driving foremen from 2012 to April 2017: Larry Coleman, Tony Dennis, and John Mobley.  *See* Ex. A, R. Shea Dec., at its Ex. C (MSB 6105).  Of these three, Larry was the highest paid, with a rate of pay of $35 as compared to Dennis at $30 and Mobley at $25.  *Id.*  The rates of pay for operators on pile-driving jobs from 2012 to 2017 reflects only one operator, Ricky Hiers ($30),[18] making more than Chester ($25), with the remaining making between $14

---

[18]Hiers had his NCCCO crane license, whereas Chester did not.  *See* Ex. J, Moore Dep., pp. 100:10-20; 129: 13-132:6.  Therefore, Hiers and Chester Coleman are not valid comparators under *Lewis*.

and $25.  *Id.* at its Ex. A (MSB 6100-6101).  Pay rates for welders on pile-driving jobs from 2012 to 2017 ranged from $14 to $20.  *Id.* at its Ex. B (MSB 6106).  As a welder, Freddie was making $20.50, the highest among those similarly situated.  *Id.*

The undisputed evidence also establishes that Plaintiffs' per diems were comparable to similarly situated employees.  For example, while assigned to the TECO Project, Larry received a per diem between $75 and $85 depending on the time of year.  *See* SOF, ¶ 53.  Larry's *superiors* on the project, Dubberly and Sam Gardner, both white superintendents (above a foreman), received the same $75 to $85 per diem throughout the TECO Project, and Tony Dennis, a white foreman, on the other hand, received between $65 and $75 per diem throughout the TECO Project.  SOF, ¶ 54; *see also* Ex. N.  Chester and Freddie's per diems were slightly lower at $65-$75 and $50-$70, respectively, as expected for non-supervisors, and their rates were comparable to other crew members.  SOF, ¶ 54; *see also* Ex. N.

In sum, Plaintiffs have not established that they were paid less than similarly situated white employees, either in pay or per diem.  Accordingly, Defendants are entitled to summary judgment on the disparate pay claims.

### B.     Disparate Treatment in the Workplace.

In Counts Eight through Thirteen, Plaintiffs allege that they suffered disparate treatment in the workplace and were subjected to a hostile work environment.[19]  To sustain a hostile work environment claim, a plaintiff must show that: (1) he belongs to a protected group; (2) he has been subject to unwelcome harassment; (3) the harassment was based on a protected characteristic of the employee such as race; (4) the harassment was sufficiently "severe or pervasive to alter the terms and conditions of employment" and created an "abusive working environment"; and (5) the employer is responsible for such environment under vicarious or direct liability.  *See Miller v. Kenworth of Dothan, Inc.*, 277 F. 3d 1269, 1275 (11th Cir. 2002).

The fourth element—that the harassment was so "severe or pervasive" to alter the employee's condition of employment—includes both a subjective and objective component.  *Id.*  The objective inquiry considers the "totality of the circumstances," including the frequency and severity of the conduct; whether the conduct was physically threatening or humiliating or a "mere offensive utterance"; and whether the conduct unreasonably interferes with the employee's job performance.  *Id.* "'[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of

---

[19] As part of their "disparate treatment" claims, Plaintiffs allege that they were paid less than similarly situated white employees and terminated because of their race.  These allegations are addressed in Section II.A and II.C, respectively.

employment.'"  *Mahone v. CSX Trans., Inc.*, 652 Fed. App'x 820, 823 (11th Cir. 2016) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998)).

The crux of Plaintiffs' hostile work environment claim is that Lee Dubberly, the superintendent on many of their jobs, used profanity and racial slurs on job sites. When pressed on this claim in their depositions, however, Plaintiffs only described isolated incidents and offhand comments that fall far short of a hostile work environment so "severe or pervasive" to change the terms and conditions of their employment, as required to prevail under Title VII or § 1981.

Specifically, Freddie testified that he heard Lee Dubberly use the word "nigger" "once," but later clarified that Dubberly used the phrase "black ass."  Ex. L, Seltzer Dep., pp. 99:18-101:8.  Other than this isolated incident, Freddie was not aware of any other times that Dubberly used "racially offensive language."  *Id.* at 102:6-9.  Chester testified that "every once in a while [Dubberly would] … call us boys," which Chester did not think was "right" because "every man out there" was over 21 and it "wasn't professional."  Ex. I, C. Coleman Dep., p. 76:13-23.[20]  He could not say when these incidents, only occurred it happened "on several occasions on jobs."  *Id.* at 77:1-6.  When pressed for any other alleged discriminatory conduct

---

[20]  Notably, the phrase "boys" was applied to the crew collectively as a whole, and no individual was called "boy" individually.  Ex. E, Dubberly Dep. II, 19:17-21.

by Dubberly, Chester replied, "That's basically just that, you know[.]" *Id.* at 80:6-14.[21]

As noted above, "isolated incidents" and "offhand comments" like those described by Plaintiffs do "not amount to discriminatory changes in the terms and conditions of [Plaintiffs'] employment." *See Mahone*, 652 Fed. App'x at 823; *cf., e.g.*, *Miller*, 277 F.3d at 1275 (supervisor's "hurl[ing] ethnic slurs at [plaintiff] three to four times a day" for period of one month while plaintiff and supervisor worked together was considered "frequent"). And while Freddie claimed that Dubberly used profanity on the job site, Freddie agreed that Dubberly used it toward both white and black employees, Ex. L, Seltzer Dep., pp. 97:9-98:8, which is insufficient. *See, e.g.*, *Brennan v. Metro. Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999) ("[A]n environment which is equally harsh for both men and women or for both young and old does not constitute a hostile work environment under the civil rights statutes.").

Larry's complaints against Dubberly also do not rise to the level of a hostile work environment. Larry testified that Dubberly referred to African American men on his crew as "boys," which he claimed he and others did not appreciate.[22]  Ex. G,

---

[21] Chester testified that Dubberly also called him "Chestine" as a nickname because Chester wore an earring for a period of time. Ex. I, C. Coleman Dep., pp. 80:6-81:6.  Of course, wearing an earring is not a "protected characteristic" and thus any such teasing cannot form the basis of a racial harassment claim. *See Miller*, 277 F.3d at 1275 (*prima facie* case requires showing that the harassment is "based on a protected characteristic of the employee, such as national origin").

[22] It is worth noting that Dubberly agreed that he would call his crew, which included both white and black employees, as "boys," but he vehemently denied that he used the term "boy" as to

L. Coleman Dep., pp. 280:12-281:7.  He also claimed Dubberly occasionally told "racial jokes," *id.* at p. 282:6-20, but when pressed for details, he could not provide any and said Dubberly "tried to base it on a way that it wasn't racial" and described it instead as "hidden racism."  *Id.* at 283:19-284:10.  Larry also claimed that Dubberly once told several African American employees "he would kill them" if they got hurt on the job, but Larry clarified that this incident occurred in a "safety meeting" and that Dubberly was "sort of making a joke about it."  *Id.* at 291:10-292:20.  And while Larry testified that Dubberly called African American employees "niggers," when questioned for details, he clarified that he "never did hear [Dubberly say it] because he wasn't going to say it in front of me." *Id.* at 295:2-8.

While Larry subjectively may have found these incidents offensive, the "totality of the circumstances" do not show a hostile work environment.  For one, other than Dubberly referring collectively to his crew as "boys," the incidents described by Larry were isolated in nature and at most akin to "mere offensive utterances." *See Miller*, 277 F.3d at 1275.  Further, although Larry said he was bothered by Dubberly calling the crew "boys," no one reported it and Larry did not

---

any individual or as a racial slur.  Ex. E, Dubberly Dep. II, pp. 18:14-19:21; 178:17-180:5.  Further, although Larry claimed he found the term racially offensive, he used it several times throughout his own deposition to refer to other MSB employees.  Ex. G, L. Coleman Dep., p. 114:19-23 ("Q: And who was the name of the white guy who tore the door off the machine?  A: What's that **boy's** name?  All I know is – they call him by a nickname."); *id.* at 153:13-21 ("There was another guy there that was … working there along with his son-in-law.  What that **boy** name?  The man name – I can't remember his name …"); *id* at 370:12-14 ("Dick Shea sent me on jobs with Lee Dubberly after the **boy** got hurt down there …").

describe any way in which this conduct "unreasonably interfered" with his job performance. *See id.* ("[R]epeated incidents of verbal harassment that continue despite the employee's objections … are indicative of a hostile work environment.").

For the same reasons, Larry's allegation that Dick Shea supposedly once told him he had a "strike against" him because he was black and warned him not to become "nigger rich" fails to establish that Shea created a hostile work environment. Further, Larry testified that this incident occurred at a job in Bowater, Tennessee, which was decades ago, remote in time, and well before Larry's most recent employment with MSB.[23]   And the overwhelming evidence is to the contrary. Chester, for example, testified that Shea "never used racial slurs," and that prior to Shea sending the Plaintiffs home, "you couldn't tell me nothing bad about [Dick Shea] of what he did."   Ex. I, C. Coleman Dep., p: 81:13-8219.   Indeed, when Chester got cancer in 2014, Shea told him "we're going to take care of you," *id.* at 29:23-30:12, and MSB continued to pay Chester for an entire year while he was unable to work.   SOF, ¶ 47.   Freddie also testified that Shea let Freddie and his brothers fish on lake property after work while they were working there.   SOF, ¶ 60.

---

[23] Larry quit MSB in 2014 to go to work for a competitor, but after several months reapplied and was rehired.   Thus, this allegation relates to a prior stint with MSB, not the employment at issue.   Further, the allegation that Dick Shea's alleged comments created an intolerable work environment are implausible, given that Larry quit Berkel in 2014 and reapplied and was hired again by MSB. *See Scott v. Harris*, 550 U.S. 372, 381 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").

Courts must be mindful that Title VII and § 1981 are not a "general civility code" that makes "ordinary tribulations of the working place" actionable. *Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F. 3d 1227, 1234 (11th Cir. 2006). That is all Plaintiffs have alleged here. Accordingly, their hostile work claims fail.

Likewise, to the extent Plaintiffs claim that they were denied advancements and promotions, Plaintiffs have failed to come forward with any similarly situated comparators who received promotions and advancement opportunities that Plaintiffs were denied, which, as discussed above, is fatal to their claims. Further, these claims are belied by Plaintiffs' own testimony. Larry testified that in all his time at MSB he never asked for a promotion and instead MSB "just elevated [him]" at various times over the years. SOF, ¶ 39. Chester, likewise, testified he "hadn't asked for [a promotion]" to become a superintendent, the only position he believed was higher than operator, or any other promotions during his employment. SOF, ¶ 46. Freddie testified that he wanted to be promoted to foreman, but the only person at MSB that he told was his brother, Larry Coleman, who never "followed through." SOF, ¶ 51. Freddie confirmed that there were no other jobs that he was denied. *Id.* Plaintiffs also testified that they never asked for additional training from MSB and were denied. SOF ¶¶ 39, 46, 51. Thus, based on their own testimony, Plaintiffs were not denied any advancement opportunities to which they believed they were entitled.

**C.     Termination.**

In Counts Fourteen through Nineteen, Plaintiffs claim that they were terminated from MSB because of their race.  To establish a *prima facie* case, Plaintiffs must establish that they were replaced by someone outside of their protected class or that they received less favorable treatment than a similarly situated employee.  *Flowers v. Troup Cty, Ga., School District*, 803 F.3d 1327, 1336 (11th Cir. 2015).  Plaintiffs can establish neither fact here.

As an initial matter, all three Plaintiffs testified that Shea sent them home because Shea believed Freddie and Chester took too long for lunch.  *See* SOF, ¶¶ 67-69.  While Plaintiffs may dispute that Freddie and Chester took too long, that is immaterial, as the reason identified by Plaintiffs is entirely race neutral.

Moreover, although two of the individuals that replaced Plaintiffs are white, one of the individuals, Larry Young, is black.  SOF, ¶ 72.  This fact alone refutes Plaintiffs' assertion that the termination was motivated by race.   To the contrary, it is consistent with Shea's testimony that he was concerned about work ethic, not the race of the employees.

Additionally, Plaintiffs cannot establish that they received less favorable treatment than other similarly situated employees outside of their protected class. As relevant to this analysis, the *Lewis* Court advised that a valid comparator will "have engaged in the same basic conduct (or misconduct) as the plaintiff," and

"ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff." *Lewis*, 918 F.3d at 1227 (citations omitted).

Here, Plaintiffs broadly assert that white employees failed drug tests and were late to work without suffering termination, but they do not allege that they received less favorable treatment for the same conduct, *i.e.*, that they were terminated because they failed a drug test or because they were late.[24]  Instead, Plaintiffs claim that Shea thought (correctly or not) that Chester and Freddie took too long for lunch and sent them home, which they did not believe was "fair" or a valid reason.  According to Larry, "nothing out of the ordinary was done for us to go home … because we had been on other jobs and we took longer than 30 minutes for lunch but … we'll work longer to make up for the time …." Ex. G, L. Coleman Dep., p. 186:14-187:4.

The problem with this rationale is two-fold.  *First*, the fact that Plaintiffs themselves regularly took excessively long lunch breaks on previous occasions does not establish discrimination in this instance; rather, it confirms Shea's observation that Plaintiffs had gotten slack in their work ethic.  *Second*, Plaintiffs have not identified any similarly situated employees who engaged in the same conduct, *i.e.*, excessive lunch or other breaks under the supervision of Dick Shea.  *See Lewis*, 918 F.3d at 1227 ("[D]isciplinary measures undertaken by different supervisors may not

---

[24] Of course, even this claim is contradicted by the evidence.  Chester, for example, failed a drug test in 1993, and was reprimanded on several occasions for workplace safety violations.  In addition, he was written up for being absent without prior approval.  *See* Ex. F, at 00349, 00351, 00354, 00391, 00392.

be comparable for purposes of Title VII analysis") (citation omitted); *see also Hester v. Univ. of Ala. Birmingham Hosp.*, 798 Fed. App'x 453, 457 (11th Cir. 2020) (purported comparator was not "similarly situated in all material respects" where comparator, among other things, answered to a different supervisor); *Hill v. Houtchens Food Grp. Inc.*, No. 1:19-cv-103-KD-C, 2020 WL 2550366, at *8 (S.D. Ala. May 27, 2020) (same); *Chapman v. Alabama*, No. 7:17-cv-01631-LSC, 2019 WL 526329, at *8 (N.D. Ala. Oct. 17, 2019) ("key consideration" in the comparator analysis "is whether the shared supervisor … conducted disciplinary proceedings for both [the plaintiff] and [his] comparators").

Further, even assuming, *arguendo*, that Plaintiffs can establish a *prima facie* case of discrimination, MSB has provided a legitimate, non-discriminatory reason for sending Plaintiffs home from the Shea Residence Project.  The undisputed evidence establishes that Shea sent Plaintiffs home because he thought they took too long for lunch.  SOF, ¶¶ 67-69.   This decision grew out of Shea's frustration with what he perceived to be Plaintiffs' poor work ethic and attitude—problems that first arose during the Mountain Lake Farms Project and continued during the Shea Residence Project.  SOF, ¶¶ 61-62.  According to Shea, he wanted Plaintiffs to "think about what they're doing" and come back to work after reflection.  SOF, ¶ 70.

To establish pretext, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (quoting *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997)).[25]  "A plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute [his] business judgment for that of the employer.  Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).

While Plaintiffs may disagree with Shea's decision, they have failed to provide any facts to rebut MSB's stated reason as a pretext for illegal discrimination. In evaluating Title VII claims, federal courts are not "super-personnel departments" assessing "the wisdom of an employer's business decision—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive." *Alvarez*, 610 F.3d at 1266.  "That is true '[n]o matter how medieval a [company]'s practices, no matter how high-handed its decisional process, no matter how mistaken the [company]'s managers.'"  *Id.* (internal citations omitted). "[E]mployers are free to fire their employees 'for a good reason, a bad reason, a

---

[25] Indeed, Freddie testified that when he and Chester returned from the convenience store with their lunch, Larry approached them as asked them whether they were "going to take all day" and then told them that Shea was "down the hill mad." SOF ¶ 67.  Freddie said he later learned from Larry that Shea "said [they were] late for coming back from lunch." *Id.*

reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason.'"  *Flowers*, 803 F.3d at 1338 (quoting *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)).  Plaintiffs have not established and cannot establish that they were terminated based on race.

### III.   Plaintiffs' Age Discrimination Claims Fail as a Matter of Law Because Plaintiffs Cannot Establish a *Prima Facie* Case of Discrimination or Rebut Defendants' Non-Discriminatory Reasons for their Employment Decisions.

In Counts Twenty through Twenty-Two, Plaintiffs claim that they terminated because of their age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-34.  As relevant here, the ADEA makes it "unlawful for an employer to … discharge any individual … because of such individual's age." § 623(a)(1).  Liability under the ADEA turns on whether the plaintiff's age "actually motivated the employer's decision."  *Chapman*, 229 F.3d at 1024 (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142 (U.S. 2000)).  In other words, the plaintiff "must prove that discrimination was the 'but-for' cause of the adverse employment action."  *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (citing *Gross v. FBL Financial Servs., Inc.*, 557 U.S. 167, 176 (2009)).[26]

---

[26] As a threshold, Plaintiffs' ADEA claims fail because, by Plaintiffs' own testimony, they were sent home because Shea thought they had taken too long for lunch, not because of their age. SOF ¶ 67-69.

As with Title VII claims, the Eleventh Circuit has adopted the *McDonnell Douglas* framework to analyze ADEA claims based on circumstantial evidence. *Liebman v. Metro Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015).  To establish a *prima facie* case, the plaintiff must show that he (1) is a member of the protected age group (i.e., over the age of forty); (2) was qualified for the position; (3) suffered an adverse employment action; and (4) was replaced by a substantially younger person.  *See Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012).  Because Plaintiffs have put forth no direct evidence of age discrimination, the *McDonnell Douglas* framework is appropriate to analyze their claims.

Defendants do not dispute that Plaintiffs have established the first and third elements of a *prima facie* case of discrimination—they were over the age of forty, and ostensibly suffered an adverse employment action; however, Plaintiffs cannot establish that they were replaced by a substantially younger person as required to meet their initial burden.[27]  *See, e.g.*, *Kragor*, 702 F.3d at 1308.  Plaintiffs were replaced by Sam Gardner, a 54-year-old; Larry Young, a 46-year-old; and Tony Dennis, a 44-year-old.  SOF, ¶ 72.  Thus, contrary to Plaintiffs' claims of "significant" age differences, all three replacements were over the age of forty, and one replacement—Sam Gardner—was older than Freddie, who was 52 at the time.

---

[27] In addition, as discussed in Section V, *infra*, to the extent Larry and Freddie have successfully obtained disability benefits based on the finding that they are totally disabled, they are estopped to claim that they are qualified for their positions.

Moreover, Plaintiffs' claim fails because they cannot prove that their age was the cause, let alone the "but-for" cause, of their termination.  *See Sims*, 704 F.3d at 1334.  Larry was 56 years old when he was rehired by MSB in 2014, and he was 57, Chester was 53, and Freddie was 49 when they were assigned to the TECO Project.  And unlike a large number of other MSB employees, many of whom were younger than Plaintiffs, Plaintiffs were not laid off following the TECO Project.  Instead, MSB attempted to retain them until the next customer project by assigning them to two special projects, even though there was no paying customer and the cost was borne by Dick Shea personally.  There is no evidence to establish that age played a role in Plaintiffs' termination, much less that it was the "but-for" cause.

Likewise, there is no evidence of pretext.  As set forth above, Plaintiffs were sent home after Shea grew frustrated by his perception of Plaintiffs' poor work ethic.  The Eleventh Circuit has held that a plaintiff may not prove pretext by simply "recast[ing] an employer's proffered non[-]discriminatory reason or substitut[ing] his business judgment for that of the employer."  *Chapman*, 229 F.3d at 1030.  If the proffered reason is one that "might motivate a reasonable employer, an employee must meet that reason head on and rebut it[.]" *Id.*

While Plaintiffs may disagree with the characterization of their job performance, they (a) all testified they were sent home because Dick Shea thought Freddie and Chester had taken too long for lunch (nothing to do with age) and (b)

have failed to provide any facts to rebut MSB's proffered reason. And the evidence is to the contrary. In addition to hiring Plaintiffs for the Mountain Lake Farms Project and Shea Residence Project, all three of whom were over the age of 50 at the time, MSB also assigned to the same project Dubberly, who is 74 years old. There are no facts to suggest that age motivated these employment decisions. Plaintiffs have not met and cannot meet their burden to establish pretext.

## IV.   Chester Coleman's Back Pay Damages, if any, Are Cut Off by MSB's Offer of Reinstatement.

Under Title VII, § 1981, and the ADEA, plaintiffs are "required to mitigate damages by being reasonably diligent in seeking employment substantially equivalent to the position [they were] denied." *See Weatherly v. Alabama State Univ.*, 728 F.3d 1263, 1272 (11th Cir. 2013). Further, "absent special circumstances, the rejection of an employer's unconditional job offer ends the accrual of potential backpay liability." *Ford Motor Co., Inc. v. EEOC*, 458 U.S. 219, 241 (1982); *see also Cowen v. Standard Brands, Inc.*, 572 F. Supp. 1576 (N.D. Ala. 1983) (ADEA plaintiff relinquished backpay by refusing employer's offer of reinstatement).

The undisputed evidence is that approximately one month after Plaintiffs were sent home from the Richard Shea Residence project, MSB called Chester to ask him to come back to work on a new project, and Chester declined because he "had another job lined up." SOF, ¶ 77. Thus, Chester's backpay damages, if any, are

barred beyond this point due to his rejection of MSB's job offer and failure to mitigate his damages.  *See, e.g.*, *Ford Motor Co.*, 458 U.S. at 241.

## V.    Larry Coleman and Freddie Seltzer Are Estopped from Claiming They Are Qualified for Their Positions Based on Their Representations to the Social Security Administration.

Judicial estoppel "prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by [that party] in a prior legal proceeding." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 46 (2nd Cir. 2015).   In the context of employment discrimination cases, a plaintiff who successfully applies for disability benefits is estopped from taking a contradictory position in a subsequent discrimination case.   *See id.* While a successful disability application does not automatically preclude a later discrimination claim, plaintiffs "cannot simply ignore the apparent contradiction that arises out of the earlier … total disability claim" and "must proffer a sufficient explanation" for the conflicting statements to survive summary judgment.   *Robinson*, 781 F.3d at 46 (citing *Cleveland v. Policy Mgmt Sys. Corp.*, 526 U.S. 795 (1999)).

Larry and Freddie have represented to the Social Security Administration ("SSA") that they are totally disabled and both are receiving benefits from the SSA based on those claims.  SOF, ¶ 79.  Freddie represented to the SSA that he has been totally disabled since March 30, 2017—prior to his alleged termination from MSB—and has been receiving benefits based on this date.  *Id.*  Freddie's representations to

the SSA, and the SSA's disability determination based upon those representations, conclusively establish that Freddie was not qualified for his job since at least March 30, 2017, and he should be estopped from taking a contrary position in this case. Thus, Freddie cannot establish an element of his *prima facie* case—that he was qualified for his position—under any theory of discrimination.

Larry, likewise, is estopped from taking a position contrary to his representations to the SSA. Defendants have been unable to obtain his complete SSA disability file to determine the date of his disability or the precise representations he made in his application. However, it is undisputed that Larry also applied for disability benefits and is receiving them. SOF, ¶ 79. Accordingly, to the extent Larry has represented to the SSA that he is totally disabled, he too should be estopped from taking a contrary position in this litigation.

CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court enter judgment in favor of Defendants on all of Plaintiffs' claims.

*s/ E. Glenn Waldrop, Jr.*
One of the Attorneys for Defendants
Morris-Shea Bridge Co., Inc. and
Richard J. Shea, Jr.

OF COUNSEL:

E. Glenn Waldrop, Jr. (WALDG7740)
*gwaldrop@lightfootlaw.com*
Kevin E. Clark (CLARK3281)
*kclark@lightfootlaw.com*
Amie A. Vague (VAGUA4113)
*avague@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 North 20th Street
Birmingham, AL  35203-3200
Telephone: (205) 581-0700
Facsimile:  (205) 581-0799

## **CERTIFICATE OF SERVICE**

This is to certify that on this 17th day of August 2020, the foregoing was served on all parties of record by electronic filing with the Court's CM/ECF system:

Alicia K. Haynes, Esq.
*akhaynes@haynes-haynes.com*
Haynes & Haynes, P.C.
1600 Woodmere Drive
Birmingham, Alabama 35226

Heather Newsome Leonard, Esq.
*heather@heatherleonardPC.com*
Heather Leonard, P.C.
P.O. Box 43768
Birmingham, Alabama 35243

Cynthia Forman Wilkinson, Esq.
*wilkinsononefile@wilkinsonfirm.net*
Wilkinson Law Firm, P.C.
215 Richard Arrington Jr. Blvd, Suite 200
Birmingham, Alabama 35203

*Attorneys for Plaintiffs Larry Coleman,*
*Chester Coleman, and Freddie Seltzer*

s/ *E. Glenn Waldrop, Jr.*
Of Counsel