FILED

2020 Nov-23  PM 01:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | | |
|---|---|---|
| LARRY COLEMAN, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:18-cv-00248-LSC |
| | ) | |
| MORRIS-SHEA BRIDGE | ) | |
| COMPANY, INC., *et al.*, | ) | |
| Defendants. | ) | |

## MEMORANDUM OF OPINION

## I.   INTRODUCTION

Plaintiffs Larry Coleman ("Larry"), Chester Coleman ("Chester"), and Freddie Seltzer ("Freddie") (collectively, "Plaintiffs"), three African-American brothers, bring this action against their former employer, Morris-Shea Bridge Company ("MSB"), and the President of MSB, Richard J. Shea, Jr. ("Shea") (collectively, "Defendants"). In Count I of Plaintiffs' Complaint, Larry asserts a claim for unpaid overtime wages under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201 *et seq.* ("FLSA"). In Counts II through VII and Counts XIV through XIX, Plaintiffs assert race discrimination claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981. In Counts VIII through XIII, Plaintiffs allege that they were subjected to a racially hostile work

environment in violation of Title VII and § 1981. In Counts XX through XXII, Plaintiffs assert claims for age discrimination under the Age Discrimination in Employment Act, 29 § 601 *et seq.* ("ADEA").

Before the Court are Defendants' Motion for Summary Judgment (doc. 75), Defendants' Motion to Strike (doc. 115), Plaintiffs' Motion to Strike (doc. 117), and Plaintiffs' Opposition to Defendants' Declaration (doc. 119). All matters are fully briefed and ripe for review. For the reasons stated below, Defendants' Motion for Summary Judgment is due to be granted in part and denied in part. Defendants' Motion to Strike is due to be granted in part and denied in part and terminated as moot in part. Plaintiffs' Motion to Strike and Opposition to Defendants' Declaration are due to be denied.

## II.   BACKGROUND[1]

MSB is a contractor specializing in two types of deep foundation work: driven piles and drilled piles. Driven piles involve the use of cranes, whereas drilled piles

---

[1]   The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cited by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .").

involve the use of a proprietary soil displacement system utilizing drills. Work with driven piles and drilled piles requires different skill sets and qualifications. For example, the Occupational Safety and Health Administration instituted a licensing requirement for operating cranes in 2010, although this requirement did not become effective until 2018. This means that operating cranes for driven piles requires a special license from an accredited organization, such as the National Commission for the Certification of Crane Operators ("NCCCO") or the Crane Institute Certification ("CIC"). MSB asserts that before this licensing requirement became mandatory, many of its customers wanted crane operators who were already certified. MSB contends that because of this preference, employees licensed to operate cranes could command higher salaries than those who were not certified.

In contrast, drill rigs used by MSB for drilled piles are not subject to any licensure requirements, although MSB offers its own certification process. MSB contends that because of the complex nature of drilling projects, employees specializing in this work can command higher salaries than, for example, unlicensed

---

Plaintiffs' brief is riddled with misrepresentations of the evidentiary record and inaccurate citations lending little to no support for Plaintiffs' contentions. The Court is not required to identify unreferenced evidence supporting a party's position. Therefore, the Court declines to comb through the record to find supporting material for Plaintiffs' assertions when Plaintiffs failed to do so in their response brief. Accordingly, the Court will disregard any statements of fact made by *either* party that are not supported by the evidentiary material to which the parties cite.

crane operators specializing only in driven piles. Some employees specialize in either driven piles or drilled piles, while some employees work on both types of projects.

MSB hires employees for each project and determines salaries based in part on the type of project. The employee's classification also determines, in part, the salary. Employees are classified based on their designation as, for example, laborer, crane operator, drill operator, foreman, or superintendent. Employees are also classified by MSB based on their skill level and years of experience.

Employees are paid hourly unless they have a supervisory role, such as a foreman or superintendent, in which case they are typically salaried. Hourly employees are entitled to overtime pay for work in excess of forty hours a week. Salaried employees receive a weekly base rate of pay plus an additional eight hours of pay if they work on the weekend. Superintendents and foremen make suggestions about pay for their crew members; however, ultimate decisions concerning compensation are made by Shea and his three sons, Richard Shea ("Richard"), Steve Shea ("Steve"), and Bill Shea ("Bill").

Plaintiffs assert that race was also a consideration when determining employee compensation. For example, Plaintiffs contend that Caucasian foremen receive overtime pay, citing to Richard's deposition testimony. However, Plaintiffs misrepresent this testimony. In his deposition, Richard stated that Tony Dennis

("Dennis") received overtime pay because he was "still hourly at $30 an hour, which is five dollars less than Larry." (Doc. 76-3 at 231.) Richard further testified that Dennis was "trying to earn the supervisory position," which is why he was kept hourly for a period of time, as opposed to Larry, who was already in a supervisory role and thus was salaried. (*Id.*)

Employees are also entitled to per diem, a hotel allowance, and mileage when they are sent to work on out-of-town projects. Employees receive variable amounts of per diem depending on factors including their position; how far they travel; what the cost of living is in the area in which they are working; and the time of year.[2]

---

[2]     Plaintiffs dispute MSB's contention that per diem rates fluctuate. Plaintiffs argue that per diem is determined solely based on an employee's job function. This assertion is not supported by Plaintiffs' citations to the evidentiary record. Plaintiffs cite to Richard's deposition testimony; however, in the cited section, Richard testifies that "in different areas, the wage rates change." (Doc. 76-3 at 64.) Furthermore, Richard's deposition testimony also supports MSB's contention that per diem rates fluctuate based on the location. Richard states that "per diem . . . fluctuates by area, depending on . . . what the cost of living is." (*Id.* at 67.)
        Plaintiffs also misrepresent the per diem received by Gary Watson ("Watson"), Dennis, and Christopher Hughes ("Hughes") in an effort to support their position. Dennis's per diem increased to $90 a day "[b]ecause the cost of living [in Texas] is higher than it is here." (Doc. 111-1 at 135.) Dennis testified that at various jobs, his rate of per diem fluctuated, but that it would increase when "the cost of living . . . was higher." (*Id.* at 137–38.) Hughes testified that his per diem "depend[ed] on the project," providing by way of example that if the project was "a Northeastern project, [per diem] would have to be raised a little bit to accommodate for the additional cost." (Doc. 100-78 at 9–10.) Plaintiffs cite to the deposition testimony of Sean Watson ("Sean"), not Gary Watson. (*See* doc. 112 at 4 n.51.)  Plaintiffs' citations to Sean's testimony do not correspond to a discussion of per diem rates. The Court presumes Plaintiffs intended to cite to Watson's deposition testimony; however, his testimony does not support Plaintiffs' contention either. Watson stated that his per diem varied based on the "location of the job" and that "the cost of living factors into" the amount of per diem he received. (Doc. 100-74 at 18.)

MSB regularly disciplined both African-American and Caucasian employees. Employees were subject to discipline, including termination, for failing drug tests and for tardiness. MSB would routinely rehire employees who had been disciplined and terminated. Larry recalls working on a job site where a Caucasian worker was late to work but was not disciplined.

### A.    Larry Coleman

Larry began working at MSB in 1980. Larry worked in a variety of positions ranging from laborer to superintendent over the course of almost thirty-seven years with MSB. Larry was not licensed by the NCCCO or the CIC and did not have any other certifications from MSB.

The parties dispute whether Larry was a pile-driving foreman or superintendent prior to his separation from MSB. Regardless of his title, Larry's responsibilities included supervising a small crew of men; assigning work; ensuring the crew safely completed assignments; and completing paperwork. On jobs where the parties agree Larry was classified as a superintendent, Larry had additional responsibilities including engaging with clients; ordering material; and completing added paperwork. MSB challenges exactly how much of these additional responsibilities Larry handled while working as a superintendent. Even when Larry was in a supervisory position, he still performed manual labor, frequently working

alongside his crew.[3] Larry explains that working alongside his crew was a personal choice, and that this was not a job requirement.[4]

Larry's most recent position at MSB in 2017 was salaried. He earned $1,400 per week, or $35 an hour, plus eight hours of pay if he worked on Saturday or Sunday, as well as per diem when appropriate.[5] Larry states that there were occasions when he had to work eighteen-to-twenty-hour days. Because he was salaried, he was not compensated for any additional work except as previously stated. Larry's per diem ranged from $75 to $85.[6]

---

[3]    Larry claims that he "devoted approximately 80 to 90% of this time performing the same work as his crew and 20% or less was devoted to supervisory functions." (Doc. 112 at 15 ¶ 18 (citing Doc. 102-1 ¶ 63).) Defendants do not dispute this assertion.

[4]    Plaintiffs claim in their response brief that Larry was *required* to work alongside his crew whereas Caucasian superintendents were not. This is unsupported by the evidentiary record, including Larry's deposition testimony. *See infra* Part IV.

[5]    Larry claims that his salary was based on a fifty-hour work week, whereas other Caucasian foremen's salaries were based on a forty-hour work week. (*See* doc. 112 at 4 ¶ 28.) However, this assertion is unsupported by Plaintiffs' citations. For example, Plaintiffs cite to Dennis's deposition for the proposition that Dennis's salary was based on forty hours of work. However, in the cited section, Dennis states that "when you work a job and you put in 70 hours a week, and then you work a job and you do 40 hours a week, you can do the math right there, and it don't come out right." (Doc. 111-1 at 142.) Dennis made this statement in response to the question "what's in your checkbook when you went from hourly to salary?" (*Id.*) This testimony, while confusing, does not support Plaintiffs' assertion that Dennis and other Caucasian foremen were paid based on a forty-hour work week.

[6]    The per diem rates for Larry, Chester, and Freddie are from the most recent major projects to which they were assigned.

Larry asserts that other foremen with less experience received higher pay and per diem, such as Dennis, a Caucasian foreman; Sam Gardner ("Gardner"), a Caucasian superintendent; and Keith Pate ("Pate"), a Caucasian superintendent. Dennis was originally hired as a laborer earning $20 an hour. Dennis was eventually promoted to pile-driving foreman, a salaried position where he earned $1,600 a week, or $40 an hour. Dennis's per diem ranged from $65 to $75, increasing to $90 when he was assigned to a project in Texas. Dennis was certified to operate a drill rig and was a certified welder. Larry was not. Larry states that Gardner earned $50 an hour, but offers no information as to Gardner's job qualifications.[7] Pate earned $2,350 a week, or $57.50 an hour. Pate was certified to operate small equipment, and he was a certified welder. Larry was neither. Pate's per diem fluctuated based on the region in which he worked, ranging from $35 a day to $95 a day.[8]

Larry had multiple interactions with Shea. As President of MSB, Shea was responsible for ensuring MSB was free from discrimination. Larry alleges that Shea made two racially offensive comments, cautioning Larry "about not becoming nigger rich," and telling him "had a strike against [him] because [he] was black." (Doc. 76-

---

[7]   Defendants did not dispute this statement of fact; therefore, it is deemed admitted for the purposes of summary judgment. *See* Fed. R. Civ. P. 56(e)(2).

[8]   Pate's per diem was $35 a day on a project in Texas, where MSB also paid for Pate's motel.

7 at 61.) Larry states that these comments were made at a project in Bowater, Tennessee. Although Defendants do not concede that these comments were made, they note that this project occurred decades ago. Larry was offended by these comments but did not report them to anyone else at MSB.

Larry also interacted with many employees at MSB, including Lee Dubberly ("Dubberly"), a Caucasian superintendent. He states that Dubberly told African-American workers to "find something to do or get off my job," which resulted in them "picking up sticks [while] the white guys stood by."[9] (Doc. 76-7 at 135, 139.) Defendants assert that this had nothing to do with race, referring to the deposition testimony of Harris, a Caucasian superintendent, who states he worked on jobs that involved "picking up rocks and sticks," and that he personally did that work. (Doc. 76-17 at 89.) Larry also asserts that Dubberly referred to African-American employees as boys and niggers, although Plaintiffs never heard Dubberly refer to them as niggers directly.[10] Dubberly claims he referred to everyone as "boys," regardless of race.

---

[9]    Larry also alleges that Dubberly made racially insensitive jokes in his presence. However, Larry was unable to elaborate any further on the nature of these jokes other than to reiterate that Dubberly told black jokes.

[10]    While Larry did not hear Dubberly call African-American employees "niggers," he heard from other workers that he did so. Henry Pettway ("Pettway"), an African-American, worked on the same crew as Larry, Chester, and Freddie. In his declaration, Pettway states he heard Dubberly refer to African-Americans "as niggers on a daily basis." (Doc. 102-5 ¶ 7.)

## B.    Chester Coleman

Chester began working at MSB in 1992, holding different positions at MSB ranging from laborer to operator.[11] The parties dispute the specific classification of Chester's most recent position at MSB but agree that he was a crane operator, although he was not licensed by either the NCCCO or CIC.[12] Chester received a raise when he was promoted to crane operator, earning $25 an hour with per diem ranging from $60 to $85.

Plaintiffs state that "MSB paid Chester less than White operators performing the same/comparable work" and that "[w]hite employees received higher per diem rates than Chester." (Doc. 112 at 17–18.) However, Plaintiffs do not cite to any evidence that can be reduced to admissible form to support these claims. Plaintiffs rely on Chester's deposition testimony in which he states he believes that James Romo ("Romo"), a Caucasian foreman, earned more than he did for comparable work because MSB was "bringing guys in, and I was only making 25 dollars an hour."

---

[11]    MSB states that Chester was employed on and off between 1992 and 2017. Plaintiffs challenge this, stating that Chester "worked continuously until 2017." (Doc. 112 at 6 ¶ 40.) Thereafter, Plaintiffs contradict their position, admitting that "Chester was fired and recalled one week later to the same project" after a drill rig was damaged. (*Id.* at 7 ¶ 43.) Furthermore, Chester testifies that, on a separate occasion, he "failed [a] drug test [and] was fired." (Doc. 76-9 at 75.)

[12]    MSB contends Chester was a pile-driving crane operator, whereas Plaintiffs state Chester was a crane operator and heavy equipment operator.

(Doc. 76-9 at 53.) Chester admits that he had no idea how much Romo earned and that he did not know if there were other Caucasian operators who were paid more than him.

Plaintiffs also cite to an MSB census from 2016, which provides basic information about a handful of employees including their classification, race, and pay. From this list, Plaintiffs do not distinguish which operators perform the same or comparable work to Chester. There are other Caucasian and African-American employees who are classified as "Crane Operator 1," which is Chester's classification, but Plaintiffs provide no additional information concerning their job responsibilities or qualifications. Some African-American and Caucasian operators classified as "Crane Operator 1" were paid more than Chester, while some were paid less. Plaintiffs make no distinction between these operators and identify no specific individuals with whom to compare Chester.

Concerning per diem, Plaintiffs cite to Dennis's deposition for evidence of a Caucasian foreman who received $90 a day. However, as previously explained, Dennis received this amount on a Texas project to account for an increase in the cost of living. Dennis was classified as a foreman when he received $90 a day; Chester was not classified as a foreman.

Chester worked on projects with Dubberly. Like Larry, Chester states he heard Dubberly refer to African-American employees as boys.

### C.    Freddie Seltzer

Freddie began working for MSB in 1989. Freddie was employed on and off, holding different positions at MSB including welder, pile driver, and crane operator. Most recently, Freddie was a certified welder on pile driving jobs earning $20.50 an hour with per diem ranging from $50 to $70. Over the course of his employment, Freddie received periodic raises.

Freddie also worked on job sites with Dubberly. On one occasion, he states that Dubberly called him "a black ass." (Doc. 76-12 at 100–01.)

### D.    The Mountain Lakes Farm and Richard Shea Residence Projects

The last projects to which Plaintiffs were assigned were at Mountain Lake Farms and Richard's residence (the "Shea Residence"). Defendants state that "in an effort to keep some of its long-time workers gainfully employed, MSB chose to use workers like Plaintiffs and continued their usual rate of pay" even though the work Plaintiffs were asked to perform was "non-equipment" manual labor, which could have been performed by unskilled laborers for between $10 and $15 an hour. (Doc. 75 at 13 ¶ 57.) In addition to their regular pay, Plaintiffs received per diem for these projects.

On the Mountain Lakes Farm and Shea Residence projects, Plaintiffs showed up late to work approximately "ten percent of the time." (Doc. 76-2 at 112.) Shea states that he observed a decline in Plaintiffs' work ethic on these projects, claiming that "they were not working diligently . . . and were taking too long for lunch." (*Id.* at 100.) Jimmy Harris ("Harris"), a superintendent on these projects, states that Plaintiffs were taking more than thirty minutes for lunch, and that he reminded Larry what the lunch policy was. After that conversation, Harris states that Larry started bringing his lunch instead of going out with Chester and Freddie.

On April 10, 2017, Plaintiffs were working on the Shea Residence when Freddie and Chester went out for lunch. The parties dispute whether they were late returning, but it is undisputed that Shea believed they took longer than thirty minutes for lunch. As such, Shea told Harris to send Freddie and Chester home from the job site. Larry had traveled to the site with Freddie and Chester, so he was given permission to leave with his brothers.

On April 11, 2017, Larry showed up to work without Freddie and Chester. Shea instructed Harris to send him home, while still paying him for a full day of work. Shortly thereafter, Hughes, a Caucasian superintendent who was also assigned to the Shea Residence, informed Linda Catlin ("Catlin"), an employee in payroll, that he

believed Plaintiffs had been fired, although Shea testified that he did not intend to terminate Plaintiffs.

On April 11, 2017, Larry was fifty-nine, Chester was fifty-five, and Freddie was fifty-two. Larry asserts that he was replaced by either Gardner, Dennis, or Hughes. Chester and Freddie assert that they were replaced by Hispanic and Caucasian employees in their twenties and thirties; however, this is not supported by the evidentiary record to which they cite.[13] Defendants state that Gardner, Larry Young ("Young"), and Dennis were transferred to the Shea Residence after Plaintiffs were sent home. Gardner, a Caucasian superintendent, was fifty-four; Young, an African-American foreman, was forty-six; and Dennis, a Caucasian foreman, was forty-four.

After Plaintiffs were sent home, they applied for and received unemployment compensation from the State of Alabama Department of Labor, representing they were laid off from MSB. Larry and Chester stated they were laid off due to a lack of work. Freddie stated he was laid off for violating a company policy.

---

[13]     Plaintiffs misrepresent Hughes's deposition testimony in an effort to show that they were replaced by substantially younger men who were Caucasian and Hispanic. Hughes states that *before* Plaintiffs were sent home, there were "four or five people" working on the Shea Residence who were responsible for the demolition of a house. (Doc. 100-78 at 133–36.) These men were in their twenties and thirties. There is nothing in Hughes's testimony to suggest that these men were used to replace Plaintiffs, in fact, Hughes testifies that he does not have personal knowledge regarding who replaced Plaintiffs.

Larry and Freddie also filed applications with the Social Security Administration ("SSA") seeking a determination that they were disabled and entitled to benefits. Larry represented that he was disabled as of April 12, 2017. Freddie represented that he was disabled as of March 30, 2017. The SSA determined that Larry and Freddie were disabled as of those dates, respectively.

On May 11, 2017, one month after the brothers were sent home from the Shea Residence, Dubberly called Chester and offered him a pile-driving job, which he declined as he had a job lined up with a different company. The parties dispute whether Dubberly extended offers to Larry and Freddie.

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact[14] and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if "the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A genuine dispute as to a material fact exists "if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor." *Greenberg v. BellSouth*

---

[14]    A material fact is one that "might affect the outcome of the case." *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

*Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (quoting *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001)). The trial judge should not weigh the evidence, but should determine whether there are any genuine issues of fact that should be resolved at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

In considering a motion for summary judgment, trial courts must give deference to the nonmoving party by "view[ing] the materials presented and all factual inferences in the light most favorable to the nonmoving party." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1213–14 (11th Cir. 2015) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)). However, "unsubstantiated assertions alone are not enough to withstand a motion for summary judgment." *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Conclusory allegations and a "mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment." *Melton v. Abston*, 841 F.3d 1207, 1219 (11th Cir. 2016) (per curiam) (quoting *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004)). In making a motion for summary judgment, "the moving party has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC*, 719 F.3d 1236, 1242 (11th Cir.

2013) (per curiam). Although the trial courts must use caution when granting motions for summary judgment, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

## IV. PRELIMINARY MATTERS

Both parties have raised substantial challenges to the other side's briefing of this summary judgment motion. Defendants seek to strike Plaintiffs' response brief for failure to comply with the Court's Uniform Initial Order (doc. 17) and Order to Show Cause (doc. 107). Defendants also seek to strike Plaintiffs' response brief alleging it contains numerous false allegations. Finally, Defendants seek to strike portions of Plaintiffs' evidentiary material, alleging that Plaintiffs have submitted exhibits and sham declarations that contain inadmissible hearsay; lack a basis in personal knowledge; and lack foundation. Plaintiffs argue that Defendants' reply brief should be stricken for failure to comply with the Court's Uniform Initial Order and for raising new arguments in their brief that were not raised in their initial motion. Plaintiffs also oppose one of Defendants' declarations, arguing that it is a sham declaration. The Court will address each challenge in turn.

## A.    Defendants' Motion to Strike (Doc. 115)

Defendants argue that Plaintiffs failed to comply with the Court's Order to Show Cause by submitting a fifty-nine-page brief with 399 footnotes in eight-point font. The Court granted Plaintiffs additional pages for their response brief but did not otherwise alter the requirements in the Court's Uniform Initial Order. The Court agrees with Defendants that Plaintiffs' liberal use of noncompliant footnotes is likely intended to circumvent the page limit for their response brief, and Plaintiffs concede that if their footnotes were in twelve-point font, their brief would have exceeded the limitations set by the Court's Order. However, the Court declines to strike Plaintiffs' response brief. Defendants responded to Plaintiffs' statement of facts and arguments raised in their response brief despite Plaintiffs' failure to comply with formatting requirements. Also, while the Court finds that many of Plaintiffs' assertions either lack evidentiary support or grossly misconstrue the cited evidentiary material, the Court declines to strike the entirety of Plaintiffs' brief. Accordingly, Defendants' Motion to Strike is due to be denied in part.

Defendants also assert that portions of Plaintiffs' evidentiary material should be stricken. Defendants argue that several declarations submitted by Plaintiffs are shams. "Variations in a witness's testimony and any failure of memory throughout the course of discovery create an issue of credibility" concerning that witness.

*Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986). This is to be distinguished from a sham affidavit or declaration, where "a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact," precluding that party from "creat[ing] such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984).

There are multiple inconsistencies between Plaintiffs' deposition testimony and their declarations. Fourteen days after Defendants filed their motion, Plaintiffs filed a response in which they attempted to explain these inconsistencies. Taking into consideration Plaintiffs' response, the Court finds that there are some direct contradictions in Plaintiffs' declarations that are not adequately explained. For example, Plaintiffs assert that Chester was fired on at least two occasions: once after failing a drug test, and once after damaging a drill rig. Yet, in his declaration, he claims that he "never received any discipline." (Doc. 102-2 at 1 ¶ 4.) These statements are clearly contradictory. Plaintiffs attempt to reconcile Chester's statements by making a distinction between "administrative termination" and discipline related to his work performance. The Court finds this explanation to be unpersuasive; however, it is unnecessary to strike this portion of Chester's

declaration as the Court did not rely upon it in its analysis. Thus, Defendants'
Motion to Strike is due to be terminated as moot in part.

Larry testifies that it was his personal choice to work alongside his crew,
whereas in his declaration he states that he was "required" to work alongside his
crew. (Doc. 102-1 at 3 ¶ 9.) These are clearly contradictory statements, and Plaintiffs
have provided no evidence to explain this contradiction.[15] To the extent that Larry's
declaration contradicts his deposition testimony without explanation, Defendants'
Motion to Strike is due to be granted in part.

Freddie's declaration also contains inconsistencies from his deposition
testimony. For example, in his declaration, he states he was "denied job advances
and promotions due to my race." (Doc. 102-3 at 3 ¶ 11.) In his deposition testimony,
Freddie states that the only person at MSB to whom he expressed an interest in a
promotion was his brother, Larry, who did not follow through with Freddie's

---

[15]     While Larry's personal choice to work alongside his crew may reflect on his "work ethic,
values, and the pride he took in this work" as Plaintiffs argue, that by no means supports the
proposition that he was *required* to work alongside his crew while Caucasian superintendents were
not. (Doc. 121 at 7.) Required means "stipulated as necessary to be done, made, or provided."
*Required*, MERRIAM-WEBSTER (Oct. 29, 2020), https://www.merriam-
webster.com/dictionary/required. Nothing in Larry's deposition testimony supports the
conclusion that he was *required* to work alongside his crew. In fact, Larry makes it clear that this
was his *choice*. Plaintiffs do not support their assertion that Larry was required to work alongside
his crew with any citations to evidentiary material other than to a single paragraph in Larry's
declaration, which directly contradicts, without explanation, his deposition testimony. The Court
finds this statement to be a sham declaration in an attempt to create a material dispute of fact where
none exists.

request. These contradictions, however, are irrelevant to the claims brought by Plaintiffs. Plaintiffs bring specific disparate treatment claims regarding pay and termination. They do not bring any failure to promote claims. Thus, this portion of Freddie's testimony and declaration are irrelevant and will be disregarded. Because the Court disregards all irrelevant evidence, it is unnecessary to consider whether this portion and other irrelevant portions of Plaintiffs' declarations should be stricken. Accordingly, Defendants' Motion to Strike is due to be terminated as moot in part.

Additionally, Defendants ask the Court to strike portions of Plaintiffs' declarations and exhibits, arguing that the declarations lack foundation; contain inadmissible hearsay; are irrelevant; and that the declarants lack personal knowledge. To the extent that this is the case, the Court disregards all evidence that is irrelevant or that cannot be reduced to admissible form at trial. Defendants object to five exhibits on the following grounds: authenticity; hearsay; best evidence rule; and lack of foundation, specifically that the preparer of the challenged exhibits had no personal knowledge or that the alleged comparators are not valid comparators.

Defendants do not challenge the content of these exhibits. This is noteworthy because three of the exhibits contain information about the race and compensation of MSB employees and could be easily authenticated and verified by MSB. In fact,

Defendants rely upon some of these exhibits as the basis of declarations submitted by MSB employees.

While it is true that the exhibits as submitted by Plaintiffs are not in admissible form, the exhibits and the information contained therein may be reduced to admissible form by trial. *See, e.g.*, *Denney v. City of Albany*, 247 F.3d 1172, 1189 n.10 (11th Cir. 2001) ("In considering a summary judgment motion, a court may only consider evidence that is admissible or that could be presented in admissible form."); 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure, § 2722 (4th ed.). As such, the Court may consider these exhibits in its ruling on summary judgment. The Court does not rely on the other two challenged exhibits in its analysis. Accordingly, Defendants' Motion to Strike is due to be denied in part and terminated as moot in part.

### B.   Plaintiffs' Motion to Strike (Doc. 117)

The Court finds Plaintiffs' Motion to Strike to be meritless, and questions why Plaintiffs seek to strike Defendants' reply brief. Plaintiffs dispute the majority of Defendants' statement of facts. In Plaintiffs' response, they include a footnote in which they attempt to incorporate every one of their disputes to Defendants' statement of facts as part of their own statement of undisputed facts. Plaintiffs then argue that their disputed facts should be deemed admitted as they are not challenged

in Defendants' reply brief. The Court hopes that Plaintiffs would not rely on such a tactic in an effort to trap Defendants. Accordingly, Defendants properly limited their reply brief to a discussion of Plaintiffs' statement of *undisputed* facts, and Plaintiffs' statement of *disputed* facts is not deemed admitted.

Furthermore, Defendants did not raise new legal theories in their reply brief. As Defendants correctly point out, Plaintiffs raise an argument based on a misinterpretation of *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), incorrectly claiming that the Supreme Court abandoned the *McDonnell Douglas* framework[16] for Title VII cases.[17] Not only is this inaccurate, but Defendants were well within their rights to respond to this argument as it was raised by Plaintiffs in their response brief. Defendants correctly state that they argued for the applicability of the *McDonnell Douglas* framework in their Motion for Summary Judgment, and that any discussion of *Bostock* resulted solely from Plaintiffs' misguided interpretation of the Supreme Court's holding. Accordingly, Plaintiffs' Motion to Strike (doc. 117) is due to be denied.

---

[16]     *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

[17]     In *Bostock*, the Supreme Court interpreted Title VII such that discrimination because of sex encompasses discrimination because of sexual orientation. *Bostock*, 140 S. Ct. at 1754. The Court did not abandon the *McDonnell Douglas* framework in its analysis.

## C.      Plaintiffs' Opposition to Declaration of Richard Shea (Doc. 119)

Additionally, Plaintiffs' Opposition to Declaration of Richard Shea is meritless. Plaintiffs cite to the sham affidavit rule in an effort to lead the Court to strike Richard's declaration, arguing that his declaration contradicts Shea's deposition testimony. Plaintiffs misapply the sham affidavit rule. This rule applies to contradictory evidence given by the *same* witness. Plaintiffs ask the Court to strike Richard's declaration as inconsistent with Defendant Shea's deposition testimony, not Richard's deposition testimony. Plaintiffs have made no coherent argument as to why Richard's declaration is a sham affidavit; therefore, the Court will not disregard or strike this declaration.

## V.      DISCUSSION

Plaintiffs bring four types of claims against Defendants. First, Larry claims that he was misclassified as an exempt employee under the FLSA, and thus is entitled to overtime wages for work performed in excess of forty hours per week. Second, Plaintiffs claim that they were subjected to discrimination on the basis of their race. Third, Plaintiffs claim they were subjected to a racially hostile work environment. Fourth, Plaintiffs claim they were subjected to discrimination on the basis of their age. Defendants have moved for summary judgment on all claims.

## A.     FLSA—Count I

Larry argues that he was misclassified as an exempt employee, thus he should be entitled to overtime wages. Under the FLSA, if an employee works more than forty hours in one week, the employer must pay the employee for those overtime hours at a rate of one and one-half times their regular rate of pay. 29 U.S.C. § 207(a)(1). A plaintiff may establish a *prima facie* case for unpaid overtime by showing that (1) the defendant employed the plaintiff; (2) the defendant is covered by the FLSA; (3) the plaintiff worked in excess of a 40 hour work week; and (4) the defendant did not pay the plaintiff overtime wages. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1277 n.68 (11th Cir. 2008). However, the FLSA also provides that "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt from minimum wage and maximum hour requirements. 29 U.S.C. § 213(a)(1).

To determine if an employee is covered by the executive exemption, the Court considers whether: (1) the employee is "[c]ompensated on a salary basis . . . at a rate of not less than $684 per week";[18] (2) the employee's "primary duty is management"; (3) the employee "customarily and regularly directs the work of two

---

[18]     At the time Plaintiffs were employed by MSB, the weekly salary threshold was $455. *See* 29 C.F.R. § 541.100 (2016).

or more other employees"; and (4) the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. § 541.100(a). The executive exemption is narrowly construed, "and the employer shoulders the burden of establishing that it is entitled to an exemption." *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008).

It is undisputed that Larry was employed by MSB; MSB is an employer covered by the FLSA; Larry routinely worked well over forty hours per week; and he was only compensated for an additional eight hours at his regular rate of pay for work performed on a Saturday or Sunday. Accordingly, Larry has stated a *prima facie* case for unpaid overtime wages under the FLSA.

Defendants argue that Larry was covered by the executive exemption and thus not entitled to overtime under the FLSA. Plaintiffs argue that Defendants waived the executive exemption when they failed to state this as an affirmative defense in their Answer. While Defendants did not raise the executive exemption as an affirmative defense, they did assert it in their Answer. (*See* doc. 29 at 3–6.) The purpose of requiring a defendant to raise an affirmative defense is to provide notice to the plaintiff. *See, e.g., Hassan v. U.S. Postal Serv.*, 842 F.2d 260, 263 (11th Cir.

1988). Here, Defendants adequately asserted the executive exemption in the body of their Answer, thereby providing sufficient notice to Plaintiffs such that they would not be prejudiced by Defendants raising this in their motion. Therefore, the Court will consider in its analysis Defendants' assertion that Larry was exempt from the FLSA.

Defendants argue that Larry was properly categorized as an executive, thus exempting him from the overtime provisions of the FLSA. It is undisputed that Larry's compensation was well above the minimum threshold. It is also undisputed that Larry regularly directed the work of two or more employees, both as a foreman and as a superintendent. Plaintiffs challenge the extent to which Larry's input was taken into consideration concerning hiring, firing, and compensation; however, this assertion is supported only by a conclusory statement made by Larry, who lacked personal knowledge as to the extent to which Defendants considered his input.[19] Whereas Plaintiffs' assertion is conclusory and unsubstantiated, Defendants provide accurate citations that support their assertion that Larry could and did make suggestions with respect to hiring, firing, and the compensation of his crew;

---

[19]    Plaintiffs assert that "Larry was not allowed to make pay suggestions or decisions." (Doc 112 at 4 ¶ 22.) For this assertion, Plaintiffs provide a single citation to a single paragraph in Larry's declaration in which he states "I have reviewed the foreign [sic] and declare under penalty of perjury that it is truthful and correct." (Doc. 102-1 ¶ 64.) However, nothing in Larry's declaration refers to whether MSB considered his input regarding compensation. Thus, stating he declares under penalty of perjury that his declaration is truthful is meaningless in this context.

therefore, this factor is deemed undisputed. The only factor remaining is whether Larry's primary duty was management. As to this factor, there is a genuine dispute among the parties.

An employee's "primary duty" is "the principal, main, major or most important duty that the employee performs. Determination of an employee's primary duty must be based on all the facts of a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a). Factors to weigh when determining an employee's primary duty include: (1) "the relative importance of the exempt duties as compared with other types of duties"; (2) "the amount of time spent performing exempt work"; (3) "the employee's relative freedom from direct supervision"; and (4) "the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* While no one factor is dispositive, a general guideline is that an employee who is performing exempt work "more than 50 percent of the time" will likely satisfy the primary duty requirement for the executive exemption. *Id.* § 541.700(b).

Here, there are questions of fact as to whether Larry's primary duty was management. It is undisputed that *some* of Larry's responsibilities included supervising a small crew of men; assigning work; ensuring the crew safely completed

assignments; and completing paperwork. Defendants question, however, how many of these managerial tasks Larry handled. Richard testifies that Larry was "not capable of doing paperwork like we need done, documentation on the jobs, [and] going to meetings." (Doc. 76-3 at 425.)

It is undisputed that Larry spent time performing manual labor with his crew on projects on which he was classified as either a foreman or a superintendent. While laboring alongside his crew may not have been required, it does not change the fact that Larry claims that most of his time was spent performing nonexempt work alongside hourly employees. Defendants do not dispute this assertion.

Additionally, while Larry was responsible for supervising his crew, he also "need[ed] supervision" by other superintendents and Shea. (*Id.*) Lastly, Defendants have not addressed whether Larry's compensation was different from the compensation of nonexempt hourly employees. Weighing all of these factors, a reasonable jury could conclude that Larry's primary duty was not management. As such, a reasonable jury could also conclude that Larry was misclassified as an exempt employee and should be entitled to overtime wages. Accordingly, Defendants' Motion for Summary Judgment is due to be denied on Count I.

### B.    Race Discrimination

Title VII prohibits, among other conduct, "discriminat[ion] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). "[A] plaintiff may use three different kinds of evidence of discriminatory intent: direct evidence, circumstantial evidence or statistical evidence." *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir.1998). Title VII and § 1981 "have the same requirements of proof and use the same analytical framework." *Id.*

Absent direct evidence of racial discrimination, such as specific statements made by the employer's representatives, a plaintiff may demonstrate circumstantial evidence of disparate treatment through the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *see also Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248 (1981).[20] Under this framework, the aggrieved employee creates a presumption of unlawful discrimination by first establishing a *prima facie* case of discrimination. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220–21 (11th Cir. 2019) (en banc). The burden then shifts to the

---

[20]    "Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581–82 (11th Cir. 1989). Because Plaintiffs have not offered any direct evidence of discrimination, the Court addresses their claims under the standards applicable to circumstantial evidence of discrimination. *See Alvarez v. Royal Atl. Devs., Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).

employer "to articulate a legitimate, nondiscriminatory reason for its actions." *Id.* at 1221 (citing *Burdine*, 450 U.S. at 253). If the employer proffers a legitimate, nondiscriminatory reason, the burden returns to the employee to prove that the employer's reason is a pretext for unlawful discrimination. *Crawford v. Carroll*, 529 F.3d 961, 976 (11th Cir. 2008). Although the *McDonnell Douglas* framework is one way of showing discriminatory intent, it is not the only way to show discriminatory intent in a Title VII or § 1981 discrimination claim. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). "[T]he plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

### 1.  Disparate Pay—Counts II, III, IV, V, VI, VII

Plaintiffs claim that they were paid less than Caucasian employees. To establish a *prima facie* case for disparate treatment in compensation, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified to receive higher compensation; (3) similarly situated individuals outside his protected class received higher compensation; and (4) he received lower compensation. *Cooper v. S. Co.*, 390 F.3d 695, 735 (11th Cir. 2004), *overruled on other grounds, Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006). To satisfy the third prong of the *prima facie* case, the proffered

comparator must be similarly situated to the plaintiff "in all material respects."[21]

*Lewis*, 918 F.3d at 1226. As the Eleventh Circuit has explained, "a valid comparison will turn not on formal labels, but rather on substantive likenesses." *Id.* at 1228. While the precise "similarity" is "to be worked out on a case-by-case basis," a similarly situated comparator "will have engaged in the same basic conduct (or misconduct) as the plaintiff"; "will have been subject to the same employment policy"; "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor"; and "will share the plaintiff's employment or disciplinary history." *Id.* at 1227–28.

Plaintiffs have not established a *prima facie* case for discrimination in compensation.[22] It is undisputed that Plaintiffs are members of a protected class.

---

[21]    The Eleventh Circuit applies the "similarly situated in all material respects standard . . . to all discrimination claims pursued under *McDonnell Douglas*." *Lewis*, 918 F.3d at 1226 n.11 (internal quotations omitted).

[22]    In this analysis, the Court will not address Plaintiffs' allegations regarding discrepancies in per diem pay. Plaintiffs rely solely on inadmissible evidence for their proposition that they were paid less per diem than Caucasian employees. Specifically, Plaintiffs rely on inadmissible hearsay, only citing to their own deposition testimony where they state that they heard that there were other Caucasian employees who earned more than they did. Defendants provide evidence in admissible form proving that Plaintiffs received the same per diem as similarly situated Caucasian employees working on the same projects. Because Plaintiffs' only evidence in support of their claim is inadmissible hearsay, they have failed to create a genuine dispute of a material fact concerning their per diem. *See Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1136 (11th Cir. 1996) (stating that a plaintiff may not "use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial"). As such, the Court will only address Plaintiffs' assertions concerning their non-per diem wages.

However, Plaintiffs have not met their burden to demonstrate that they were qualified to receive higher compensation. Although it is not their burden, Defendants present evidence that employees' wages are determined, in part, based on their skill level and certifications. Employees, like Plaintiffs, who lacked certain licenses and certifications, were generally paid less than employees who were certified. Plaintiffs argue that they were denied the opportunity to receive additional training and certifications which impacted their compensation; however, this is belied by the evidentiary record and is not supported by Plaintiffs' citations.

Furthermore, Plaintiffs have failed to provide any meaningful comparators. Plaintiffs' proffered comparators are not similarly situated to them in "all material respects." Plaintiffs rely heavily on job classifications but not on substantive likeness. Plaintiffs provide a laundry list of employees who were paid more than them but fail to engage in a discussion of the meaningful characteristics of their comparators. For example, Larry provides a list of nine employees classified as foremen and fourteen employees classified as superintendents. A similarly situated comparator for Larry would have similar job responsibilities, similar licenses or certifications, and a similar employment history. Thus, a proper comparator would, at the very least, be either a foreman or superintendent who lacked an NCCCO or CIC license, and who had no other certifications from MSB. Larry does not identify a single comparator with these

characteristics. Without more, Larry cannot establish a valid comparator, thus he has not made out a *prima facie* case for disparate treatment in compensation.

Chester and Freddie have also failed to offer comparators who are similarly situated to them in all material respects. As with Larry, Chester and Freddie do not provide any meaningful comparators other than to allege generally that Caucasian employees with the same job titles were paid more than they were. However, even that statement is inconsistent with Plaintiffs' evidence. Chester identifies twelve Caucasian employees who earned more per hour than he did; however, Chester does not address the fact that there is also a Caucasian employee who earned less per hour than he did. Jamie R. Caudle, a Caucasian employee classified as "Crane Operator 1," earned $18 per hour, compared with Chester, who earned $25 per hour. (Doc. 100-9 at 2.) Regardless, Chester provides no discussion of the meaningful characteristics of any of the proffered comparators, such as whether they were NCCCO or CIC licensed. The same holds true for Freddie, who relies solely on job classifications to identify a single comparator.

Plaintiffs fail to identify any comparators as part of their *prima facie* case for disparate treatment in compensation, thus they have not met their burden at summary judgment.[23]

Even if Plaintiffs had established a *prima facie* case for disparate treatment in compensation, Defendants proffered legitimate, nondiscriminatory reasons for any hypothetical differences in compensation, including differences in skill sets of employees; the presence or absence of licenses; and the types of projects to which Plaintiffs were assigned. Defendants meet their burden of production with these proffered nondiscriminatory reasons for differences in compensation. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc) ("[T]he employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff.'" (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)).

Since Defendants state legitimate, nondiscriminatory reasons for the differences in compensation, the burden shifts back to Plaintiffs to demonstrate that

---

[23]    Although the burden is on Plaintiffs to demonstrate proper comparators, Defendants have offered evidence demonstrating that Plaintiffs' compensation was within the normal range for the types of jobs on which they worked, and in some cases was higher than other employees with similar classifications. (*See* doc. 76-21.)

these reasons were pretextual. Plaintiffs have not argued that any of Defendants' legitimate, nondiscriminatory reasons for differences in compensation were a pretext for unlawful discrimination. Plaintiffs have failed to make this argument before the Court and have failed to demonstrate a *prima facie* case for disparate treatment in compensation. Accordingly, Defendants' Motion for Summary Judgment is due to be granted as to Counts II-VII.

### 2. Termination—Counts XIV, XV, XVI, XVII, XVIII, XIX

Plaintiffs also claim they were discriminated against based on race when Defendants allegedly terminated them in April 2017. To establish a *prima facie* case for wrongful termination, a plaintiff must show: (1) he is a member of a protected class; (2) he was qualified for the position from which he was terminated; (3) he was terminated; and (4) he was replaced by an individual outside of his protected class or he was treated less favorably than similarly situated individuals outside his protected class. *See Maynard v. Bd. of Regents of the Div. of Univs. of the Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

It is undisputed that Plaintiffs are members of a protected class and that Chester was qualified for the position from which he was allegedly terminated. Defendants contend that Larry and Freddie were not qualified on the basis of their

representations to the SSA.[24] Defendants also contest the characterization of Plaintiffs' separation from MSB as a termination.[25] The crux of Defendants' argument, however, focuses on the fourth prong of Plaintiffs' *prima facie* case, which is dispositive.

Plaintiffs have failed to meet their burden of showing that they were replaced by individuals outside of their protected class. Larry challenges Defendants' assertion that Young, an African-American foreman, was one of Plaintiffs' replacements, instead claiming that either Hughes, Dennis, or Gardner replaced him, all of whom are Caucasian. However, the evidence to which Larry cites does not support this proposition.[26] Taking Defendants' assertion as true as it is the only

---

[24]    Defendants argue that because Larry and Freddie represented to the SSA that they were disabled as of April 12, 2017, and March 30, 2017, respectively, they were no longer "qualified" when they were sent home on April 11, 2017. Because the Court finds the fourth prong of the applicable standard to be dispositive, the Court does not discuss whether Larry and Freddie were qualified.

[25]    Because the Court finds the fourth prong of the applicable standard to be dispositive, the Court does not discuss whether Plaintiffs were terminated.

[26]    Plaintiffs' argument is contradictory. Plaintiffs assert that Gardner, Dennis, and Young were not transferred to the Shea Residence project until after Plaintiffs filed EEOC charges and informed Defendants that they would be pursing litigation, arguing that these employees were not Plaintiffs' replacements. This is not supported by Plaintiffs' citations to the evidentiary record. For example, the evidence to which they cite shows Young being transferred *from* the Shea Residence to a new project on May 22, 2017, which occurred shortly *after* MSB received Plaintiffs' litigation hold letter.
        Implicitly acknowledging this, Larry subsequently argues that "Defendants replaced [him] either with Hughes, Dennis, or Gardner." (Doc. 112 at 27.) Plaintiffs ignore the fact that Young was also transferred to the Shea Residence, because that would be dispositive on this prong of their

statement supported by accurate citations to the evidentiary record, one of the men who allegedly replaced Larry was also African-American. Thus, Larry has not met his burden of demonstrating that his purported replacement was outside of his protected class.

Likewise, Chester and Freddie do not identify anyone outside of their protected class who replaced them. Chester and Freddie do not assert that either Gardner, Dennis, or Young replaced them. Rather, they assert that a crew of Caucasian and Hispanic employees replaced them on the jobsite. However, Chester and Freddie lack personal knowledge as to whom their replacements were, and, as previously stated, Plaintiffs fail to support their assertion with citations to the evidentiary record.[27] Thus, Chester and Freddie have failed to demonstrate that they were replaced by employees outside of their protected class.

Additionally, Plaintiffs have failed to demonstrate that they were treated less favorably than similarly situated individuals outside their protected class as an alternative method of establishing the fourth prong of their *prima facie* case. Plaintiffs provide no comparators for Larry. Therefore, Larry has not demonstrated a *prima facie* case for wrongful termination either based upon an assertion that he was

---

*prima facie* case. If Larry was replaced by an employee who is also African-American, then there is no presumption of disparate treatment based on race and the claim fails.

[27]     *See supra* note 13.

replaced by or treated less favorably than similarly situated individuals outside his protected class.

Chester and Freddie have also failed to provide any comparators who are similarly situated in all material respects. They provide a single comparator, Doug Earl ("Earl"), a Caucasian employee, who they claim was late returning from lunch on a different project and who was not disciplined for that action. However, Plaintiffs fail to provide any other information relevant to the comparator analysis, such as whether Earl worked under the same supervisor as Plaintiffs, and whether he had a similar employment and disciplinary history to Plaintiffs. For example, Chester testifies that he was fired for failing a drug test and also fired after a drill rig was damaged. Plaintiffs also concede that they were routinely late to work. Defendants claim that Plaintiffs repeatedly took too long for lunch. Whether Earl has a similar history is relevant for the comparator analysis. While Plaintiffs do not need to offer a comparator who is identical in every way, Plaintiffs have provided no information about Earl other than to allege in deposition testimony that he is Caucasian and that he was late returning from lunch on a single occasion on an unrelated job. This is insufficient to demonstrate that Earl is similarly situated to Chester and Freddie in all material respects; therefore, they have not stated a *prima facie* case for wrongful termination.

Even assuming, *arguendo*, that Plaintiffs could state a *prima facie* case for discrimination, Defendants offer legitimate, nondiscriminatory reasons for terminating Plaintiffs. Shea states that Plaintiffs routinely showed up late to work; that they repeatedly took too long for their lunch breaks; and that he perceived a noticeable decline in Plaintiffs' overall work ethic. Having provided legitimate, nondiscriminatory reasons for terminating Plaintiffs, the burden shifts back to Plaintiffs to show that Defendants' reasons were pretextual.

A "plaintiff can show pretext 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Kragor v. Takeda Pharms. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (quoting *Burdine*, 450 U.S. at 256). In determining whether the proffered reason is pretextual, courts are not in the "business of adjudging whether employment decisions are prudent or fair," but rather "whether unlawful discriminatory animus motivates a challenged employment decision." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999).

Plaintiffs fail to demonstrate that Defendants' legitimate, nondiscriminatory reasons for terminating Plaintiffs were pretextual. Plaintiffs argue that MSB deviated from its disciplinary policy when it terminated Plaintiffs. However, Plaintiffs have

failed to show that this was the case. Plaintiffs rely upon MSB's handbook that describes a progressive discipline policy. What Plaintiffs fail to show, however, is that this policy was applied differently to them than to other employees. While Plaintiffs are correct that a reasonable jury could infer that Defendants' reasons for terminating them could be pretextual if MSB had a disciplinary policy that was applied differently to Caucasians than to African-Americans, Plaintiffs have failed to demonstrate such here.

Plaintiffs also argue that two comments made by Shea to Larry demonstrate racial bias against African-Americans. However, Larry worked for MSB for over thirty years, and over the course of that time, he recounts two offensive comments made by Shea that were remote in time to his termination. This is insufficient to demonstrate that Defendants' reasons for terminating Plaintiffs were pretextual.

Additionally, Plaintiffs argue that Shea could not have believed that Freddie and Chester returned late from lunch, but the only basis for this assertion is Larry's testimony in which he states he told Shea that Freddie and Chester were not late. This is insufficient to demonstrate that Shea could not have had a sincere belief that Freddie and Chester were late returning from lunch. Even if Plaintiffs had stated a *prima facie* case for wrongful termination, they have failed to show that Defendants' legitimate, nondiscriminatory reasons for terminating Plaintiffs were pretextual.

Plaintiffs attempt to argue in the alternative that they have presented a "convincing mosaic" of evidence to support that they were terminated from MSB because of their race. "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith*, 644 F.3d at 1328 (footnote omitted) (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)). However, the majority of Plaintiffs' allegations they rely upon to create a "convincing mosaic" are unsupported by the evidentiary record to which they cite. The only allegations raised by Plaintiffs in this argument that are supported by the evidence concern statements Dubberly allegedly made to Plaintiffs. However, Dubberly did not tell Plaintiffs to leave the Shea Residence nor was he responsible for their termination. If true, some of Plaintiffs' allegations suggest that MSB's worksites were run in a racially insensitive manner. Racial insensitivity does not, however, prove racial discrimination. In sum, Plaintiffs have not provided evidence that creates a "convincing mosaic" of discrimination such that they can survive summary judgment. Accordingly, Defendants' Motion for Summary Judgment is due to be granted as to Counts XIV–XIX.

## C.   Hostile Work Environment—Counts VIII, IX, X, XI, XII, XIII

Plaintiffs bring hostile work environment claims based on alleged racial harassment and disparate treatment. A separate violation of Title VII and § 1981 occurs when "the workplace is permeated with [racially] discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (alterations in original). An employer can be held liable if the employee proves that: (1) he is a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was based on the individual's membership in the protected class; (4) it was "severe or pervasive" enough to alter the terms and conditions of employment and create a hostile environment; and (5) the employer is responsible for this environment either directly or vicariously. *Id.* To meet the fourth element, the plaintiff must show that the conduct is both subjectively and objectively "severe or pervasive." *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999). In evaluating the objective severity of the harassment, the court considers: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Adams*

*v. Austal, U.S.A., L.L.C.*, 754 F.3d 1240, 1250–51 (11th Cir. 2014) (quoting *Mendoza*,

195 F.3d at 1246).

At issue here is whether the alleged harassment to which Plaintiffs were subjected was objectively severe or pervasive enough to alter the terms and conditions of employment. Plaintiffs claim they were subjected to a hostile work environment based on the following incidents that occurred over decades of employment at MSB: three incidents involving racial slurs (the "nigger rich" comment; the "strike against him" comment; and the "black ass" comment); being referred to as "boys"; being told to pick up sticks on jobsites while Caucasian workers stood by; hearing racially offensive jokes; and having a general awareness that the term "nigger" was used daily, albeit not directly at Plaintiffs.[28]

Construing the evidence in the light most favorable to Plaintiffs, a reasonable person in their position would not perceive the alleged harassment as sufficiently severe or pervasive as to alter the terms or conditions of their employment. Plaintiffs describe isolated instances of racially offensive comments and behavior that occurred over decades of employment. With the exception of the "nigger rich" comment directed toward Larry, Plaintiffs testify that they never heard "nigger"

---

[28]     Plaintiffs also argue that Caucasian employees used profanity on job sites that was directed toward African-American employees, and not Caucasian employees. Plaintiffs contradict this assertion in their deposition testimony, admitting that profane language was routinely used on job sites regardless of race.

used around them. Although the term "nigger" is severe, again, Plaintiffs never heard it used, nor was it directly threatening to them. The Court recognizes that using the term "boys" to refer to African-Americans can be objectively severe or pervasive; however, Defendants contend that all employees are referred to as "boys," regardless of race.

Each individual incident described by Plaintiffs would not be enough on its own to demonstrate the alleged harassment was objectively severe or pervasive. Even considering Plaintiffs' allegations in their totality, Plaintiffs have not demonstrated that these incidents altered the terms or conditions of their employment. Not only did Plaintiffs continue to work for MSB for decades, but Plaintiffs make no argument that any of these incidents unreasonably interfered with their job performance. Even when construing the evidence in the light most favorable to Plaintiffs, none of the evidence is sufficient to demonstrate they faced harassment that was severe or pervasive enough to alter the terms and conditions of their employment. *See, e.g.*, *McCann v. Tillman*, 526 F.3d 1370, 1378–79 (11th Cir. 2008) (finding that a few racially insensitive comments over the course of several years were "too sporadic and isolated to establish that [the] employers' conduct was so objectively severe or pervasive as to alter the terms and conditions

of . . . employment"). Accordingly, Defendants' Motion for Summary Judgment is due to be granted as to Counts VIII-XIII.

### D.    Age Discrimination—Counts XX, XXI, XXII

Plaintiffs also allege that they were terminated because of their age in violation of the ADEA. The ADEA prohibits discrimination "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). ADEA claims that rely upon circumstantial evidence are analyzed using the *McDonnell Douglas* burden-shifting framework. *See Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015).

To establish a *prima facie* case of age discrimination, the plaintiff must demonstrate that: "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." *Id.* The Eleventh Circuit has found that the third requirement may be satisfied by demonstrating that the plaintiff was replaced by an employee who was only several years younger than the plaintiff. *See, e.g.*, *Damon*, 196 F.3d at 1360 (finding that a forty-two year old plaintiff who was replaced by a thirty-seven year old employee met the ADEA's

"substantially younger" replacement requirement); *Carter v. DecisionOne Corp.*, 122 F.3d 997, 1003 (11th Cir. 1997) (per curiam) (finding that a three-year age difference between the plaintiff and her replacement satisfied the ADEA's "substantially younger" requirement). *See also Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1433 (11th Cir. 1998) (stating that a plaintiff "need not show that a person outside of the plaintiff's [protected] class" replaced the plaintiff).

Once a plaintiff establishes a *prima facie* case of age discrimination, the burden shifts to the defendant to provide a legitimate, nondiscriminatory reason for the plaintiff's termination. *Liebman*, 808 F.3d at 1298. Then, the burden shifts back to the plaintiff to show that the proffered reason is pretextual. *Id.* The plaintiff has the "burden of persuasion . . . to proffer evidence sufficient to permit a reasonable factfinder to conclude that the discriminatory animus was the 'but-for' cause of the adverse employment action." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009)).

It is undisputed that Plaintiffs are members of a protected group (over forty years of age) and that they were subjected to an adverse employment action.[29] At issue is whether Plaintiffs' replacements were "substantially younger" to support

---

[29] Although Defendants dispute the nature of Plaintiffs' separation from MSB, they do not dispute that Plaintiffs suffered an adverse employment action for the purposes of Plaintiffs' ADEA claim. (*See* Doc. 75 at 41.)

an inference of age discrimination, and whether Plaintiffs were qualified. At the time of their termination, Larry was fifty-nine, Chester was fifty-six, and Freddie was fifty-two. Plaintiffs argue that they were replaced by men in their twenties and thirties, although this is not supported by their citations to the evidentiary record. Defendants state that the three employees who replaced Plaintiffs were fifty-four, forty-six, and forty-four years old. It is not clear which employee replaced which Plaintiff, thus it is possible that Freddie, who was fifty-two, was replaced by an older employee, who was fifty-four. Regardless, the Court assumes, *arguendo*, that Plaintiffs collectively were replaced by "substantially younger" men, thus they satisfy this portion of their *prima facie* case.

The parties do not dispute that Chester was qualified, thus Chester has stated a *prima facie* case for age discrimination. Defendants argue that Larry and Freddie should be estopped from claiming that they were qualified for their positions because of their representations to the SSA, and the SSA's determination that they were totally disabled. Defendants cite to a Second Circuit decision for the proposition that a plaintiff may not make a representation to the SSA of total disability, and then "perform an about-face and assert that [he] is a qualified individual who is capable of working." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 47 (2d Cir. 2015)

(quoting *Lee v. City of Salem*, 259 F.3d 667, 674 (7th Cir. 2001)).[30] Rather, a plaintiff "must demonstrate that the assertion [of total disability] was . . . consistent with [his] ability to perform the essential functions of [his] job." *Id.* (quoting *Lee*, 259 F.3d at 674). In *Robinson*, the plaintiff was terminated from her position on September 23, 2010. *Id.* at 43. She subsequently received disability benefits after a determination that she was disabled as of June 14, 2010. *Id.* The plaintiff argued that although her date of disability effectively predated her termination, because she worked up until her termination, she was qualified at the time she was fired. *Id.* at 47. The court found this to be insufficient to explain the contradiction between the claim that she was both totally disabled and also qualified. *Id.*

Unlike the plaintiff in *Robinson*, Larry did not represent that he was disabled until one day after he was terminated. Thus, at the time of termination, Larry can represent that he was qualified for his job; therefore, Larry states a *prima facie* case for age discrimination.

However, like the plaintiff in *Robinson*, Freddie represented to the SSA that he was disabled as of March 30, 2017 and was not sent home until April 11, 2017, arguing that he must have been qualified because he continued working past the date by which the SSA determined he was disabled. This does not explain the

---

[30]     While this case is not binding on the Court, it is persuasive.

contradiction between Freddie's position that he was both totally disabled and also qualified. Thus, he cannot state a *prima facie* case for age discrimination.

Since Larry and Chester state *prima facie* cases for age discrimination, and assuming, *arguendo*, that Freddie does as well, the burden of production shifts to Defendants, who offer the same legitimate, nondiscriminatory reasons for terminating Plaintiffs as stated in their race discrimination claims. Thus, the burden shifts back to Plaintiffs to show that Defendants' reasons were pretextual.

Plaintiffs have offered no evidence to suggest that Defendants' legitimate, nondiscriminatory reasons for terminating their employment were pretextual for terminating them because of their age. Plaintiffs incorporate by reference their pretext analysis for their race discrimination claims, which focuses on disparate treatment between African-Americans and Caucasians.[31] Even if this analysis was relevant to their age discrimination claims, Plaintiffs have proffered nothing to suggest that their age motivated Defendants' actions. Thus, Plaintiffs cannot demonstrate pretext. Accordingly, Defendants' Motion for Summary Judgment is due to granted on Counts XX-XXII.

---

[31]    *See supra* Part V.B(2).

## VI.    Conclusion

For the reasons stated above, Defendants' Motion for Summary Judgment (doc. 75) is due to be GRANTED as to Counts II through XXII and DENIED as to Count I. Defendants' Motion to Strike (doc. 115) is due to be GRANTED IN PART and DENIED IN PART and TERMINATED AS MOOT IN PART. Plaintiff's Motion to Strike (doc. 117) is due to be DENIED. An order consistent with this opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on November 23, 2020.

L. Scott Coogler
United States District Judge

202892