FILED
2021 Sep-27  PM 02:51
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| LARRY COLEMAN, *et al.*, | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 2:18-cv-00248-LSC |
| | ) | |
| MORRIS-SHEA BRIDGE | ) | |
| COMPANY, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OF OPINION

Litigants have an obligation to refrain from "playing fast and loose with the courts," and from using "intentional self-contradiction . . . as a means of obtaining [an] unfair advantage." *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987) (quoting *Scarano v. Central R. Co.*, 203 F.2d 510, 513 (3d Cir. 1953)). Here, the Plaintiffs violated that duty in an apparent attempt to gain an unfair advantage.

Plaintiffs Larry Coleman ("Larry"), Chester Coleman ("Chester"), and Freddie Seltzer ("Freddie") (collectively, "Plaintiffs"), three African American brothers, brought this action against their former employer, Morris-Shea Bridge Company ("MSB"), and the President of MSB, Richard J. Shea, Jr. ("Shea") (collectively, "Defendants"). Plaintiffs asserted twenty-two claims against

Defendants for race discrimination, age discrimination, and unpaid overtime wages under the FLSA. (*See* doc. 18.) Defendants filed a motion for summary judgment on all claims. (Doc. 75.) The Court granted Defendants' motion as to twenty-one of twenty-two claims. (*See* docs. 123 & 124.) The remaining claim, Larry's FLSA claim for unpaid overtime wages, was presented before a jury, which found in favor of Defendants. (*See* doc. 156.)

During the trial, the Court expressed concern regarding testimony elicited from Chester and Larry by their counsel. Chester and Larry made completely contrary representations during trial to their sworn deposition testimony and declarations, which were presented to this Court in opposition to Defendants' motion for summary judgment. Larry also appears to have made completely contrary representations to the Social Security Administration ("SSA") in an application for disability benefits.

At the conclusion of the trial, the Court ordered Plaintiffs to show cause as to why they should not be judicially estopped from making contradictory assertions of fact in their claims against Defendants. (*See* doc. 160.) Plaintiffs filed a response to the order on July 22, 2021. (Doc. 164.) Defendants filed a reply on July 30, 2021. (Doc. 165.) Plaintiffs filed a motion seeking leave to respond to the Defendant's reply because Defendants suggested sanctions might be appropriate in their reply. (Doc.

166.) On August 10, 2021, this Court granted that motion and ordered Plaintiffs to respond by August 16, 2021. (Doc. 172.) On August 12, 2021, Plaintiffs filed another motion for extension of time to retain counsel before filing their response. (Doc. 173.) This Court granted that motion and gave Plaintiffs until August 20, 2021 to retain counsel and file their response. (Doc. 174.) On August 20, 2021, Plaintiffs filed a response to Defendants' reply to the show cause order and a response to Defendants' suggestion of sanctions. (Doc. 176 & 178.)

I.   **BACKGROUND**

The Court's concerns regarding this case began at the summary judgment stage where Plaintiffs made multiple misrepresentations in their briefs and evidentiary citations submitted to this Court. Thus, before addressing the inconsistencies at trial, the Court will address some of the ways in which it would appear that Plaintiffs attempted to manipulate the summary judgment process.

First, Plaintiffs sought excessive extensions of time and blatantly disregarded this Court's orders. This case was filed in January 2018. This Court is responsible for managing its docket and as such, it requires parties to follow its scheduling order to allow for timely disposition of cases. That being said, the Court recognizes that extensions of time are sometimes necessary and thus granted Plaintiffs and Defendants multiple extensions throughout this case. (*See* docs. 41, 44, 46, 53, & 71,

86.) Some of these extensions of time were for Plaintiffs to submit their response to Defendants' motion for summary judgment. Defendants filed their timely motion on August 17, 2020. As stated in the Uniform Initial Order, Plaintiffs' response brief was due twenty-one days thereafter. (*See* doc. 17 at 13.)  Plaintiffs requested an additional two weeks to respond to Defendants' motion. (*See* doc. 85.) Concerned that this Court had already granted numerous extensions of time, the Court granted in part Plaintiffs' motion, providing them with an additional seven days in which to file their response brief. (*See* doc. 86.) Plaintiffs then sought an additional seven-day extension of time (*See* doc. 87), which this Court granted. (*See* doc. 90.) Finally, Plaintiffs requested an additional eleven days to respond to Defendants' motion. (*See* doc. 97.)  That request was denied; however Plaintiffs were permitted to supplement their response to Defendants' motion after taking two outstanding depositions if needed. (*See* doc. 99.) Plaintiffs then submitted a ninety-nine-page response brief that did not comply with this Court's Uniform Initial Order. (*See* doc. 17 at 14 ("Initial and response briefs are limited to thirty pages.").) Instead of striking their brief for failure to comply with this Court's Order, the Court gave Plaintiffs leave to file a brief not to exceed fifty-nine pages. Plaintiffs complied with this Order in part. Their brief still did not comply with the requirements of the Court's Uniform Initial Order as Plaintiffs' footnotes were in 8-point type instead of 12-point type, perhaps

in an effort to circumvent the page limitation (*see id.* at 10); however, preferring to rule on the merits of Defendants' motion with the benefit of Plaintiffs' briefing, the Court declined to strike Plaintiffs' brief.

Second, even with extensions of time and additional pages in which to respond to Defendants' motion for summary judgment, Plaintiffs' briefing contained extensive apparent misrepresentations, many of which were outlined in this Court's Opinion. (*See generally* doc. 123.) In the following paragraphs, the Court will address some of these misrepresentations.

In their motion for summary judgment, Defendants asserted as an undisputed fact that per diem rates of pay for employees at their company fluctuated based on factors such as cost of living, distance of travel, and the employee's position. (Doc. 75 at 6 ¶ 26.) Defendants supported this assertion with citations to the evidentiary record. Plaintiffs challenged this assertion, specifically stating that Plaintiffs "[d]ispute that per diem rates fluctuate." (Doc. 112 at 4 ¶ 26 & n.50.) However, Plaintiffs cited to deposition testimony that did not support this assertion and instead supported Defendants' position that per diem rates fluctuated based on a variety of factors. (*See* doc. 123 at 5 n.2.) As noted in the Court's Opinion, Plaintiffs cited to Shea's deposition in which he stated that "in different areas, the wage rates change" and that "per diem . . . fluctuates by area, depending on . . . what the cost of living

is." (Doc. 76–3 at 64 & 67.) Obviously, this quote does not support Plaintiffs' assertion that per diem rates did not fluctuate as they cited to deposition testimony that stood for the contrary position.

Plaintiffs then filed a Motion to Reconsider, arguing that the Court misconstrued their position and accusing the Court of resolving material disputes of fact in favor of Defendants. (*See* doc. 132 at 10–14.) Even in this, Plaintiffs misrepresented their own summary judgment brief as well as this Court's Opinion. Plaintiffs repeatedly cited to page thirty-nine of their response brief for the proposition that "Plaintiffs clearly admit that per diem rates may fluctuate based on cost of living in the area where an employee is required to work." (*See* doc. 132 at 10.) Obviously, if Plaintiffs dispute that per diem rates fluctuate, they have not "clearly admitted" that per diem rates fluctuate. As Plaintiffs cited to this deposition testimony to dispute Defendants' assertion that per diem rates fluctuated, Plaintiffs' argument that the Court improperly relied on their own evidence is perplexing.

As another example, Defendants asserted that hourly employees were paid overtime for work "in excess of forty hours a week or on scheduled holidays." (Doc. 75 at 7 ¶ 28.) Defendants supported their assertion with a citation to their employee handbook. (*See* doc. 76-4 at 10.) Plaintiffs disagreed with this representation and asserted as part of their response that "Larry's salary was based on a 50-hour work

week; Watson's and Dennis' [two other employees] were based on 40 hours." (Doc.
112 at 4 ¶ 28 & n.54.) While Plaintiffs' assertion is not a direct response to
Defendants' statement as Larry was not an hourly employee, Plaintiffs offered no
evidence to support their assertion. Instead, Plaintiffs cited to Larry's deposition
testimony (doc. 76-7 at 116:17–23); Sean Watson's deposition testimony (doc. 100-
77 at 15:3–8); and Tony Dennis's deposition testimony (doc. 111-1 at 142:18–22).
(*See* doc. 112 at 4 ¶ 28 & n.54.) But the cited deposition testimony does not even
remotely relate to Plaintiffs' assertion. The cited testimony from Larry's deposition
is as follows:

> Q: As the superintendent, did you have the authority to
> rectify that situation?
> A: No.
> Q: Okay. Why do you say that?
> A: Because there was other superintendents on that job
> before I did had—had seniority and they—and, you know,
> they was there before I got there. So I wasn't the – the head
> – the head man

(Doc. 76-7 at 116:17-23–117:1.) The cited testimony from Sean Watson's deposition
testimony is as follows:

> A: The day I received the summons, I did text him and let
> him know that I had been summoned—a subpoena.
> Q: The subpoena, when you received that?
> A: Yes, ma'am.

(Doc. 100-77 at 15:3–8.) The cited testimony from Tony Dennis's deposition is as follows:

> A: Just when you—when you work a job and you put in 70 hours a week, and then you work a job and you do 40 hours a week, you can do the math right there, and it don't come out.

(Doc. 111-1 at 142:18–22.) The deposition excerpts provided by Plaintiffs in no way supported their assertion that Larry's salary was based on a fifty-hour work week, whereas other employees' salaries were based on a forty-hour work week.

Plaintiffs' also challenged Defendants' assertion that Larry engaged in some supervisory duties at MSB. Defendants quoted from Larry's deposition testimony, stating that Larry's "duties included 'giv[ing] out work assignment[s], mak[ing] sure that [the crew] did what they was (sic) assigned to do.'" (Doc. 75 at 12 ¶ 37 (quoting doc. 76-7 at 41: 9–13).) Defendants also quoted from Shea's deposition testimony to support their assertion that Larry supervised and directed a crew of several workers. (*See id.* (quoting doc. 76-2 at 123:8–124:9 & 397:16–398:6).) Plaintiffs disputed this, without explanation, and then cited to the following sections from Larry's deposition testimony (*see* doc. 112 at 8 ¶ 37 & n.73):

> A: It was different because I went back—I went back as a—as a pile—as a pile driving foreman when I went back because that what Tony—Tony had hired me back as a pile-driving foreman. And I was able to run a crew, you know, tell the guys—you know, tell the guys what to do,

you know. And just take—because I was the night shift foreman. I was—I was pretty much over the whole thing at the time.

Q: When you say the whole thing, what do you mean?

A: The whole job, the whole night shift.

Q: And as part of your duties being over the entire night shift, did you have to do any paperwork for your crew?

A: Yes, I did.

Q: Tell me about that.

A: Had to fill out the time sheets. Basically back then it was time sheets, and if I got a delivery in, I had to, you know, sign for it.

Q: Any other paperwork?

A: That I—not that I can recall at the time.

Q: And were you able to complete that paperwork yourself?

…

Q: And you recall specifically that Mr. Shea did make you a superintendent at some point during that job at Bowater?

A: Yes.

Q: Is that correct?

A: Yes.

Q: And how did your job duties change as a superintendent versus what they had been as a foreman?

A: It changed—it changed from—it gave me more responsibility. I had to work—I had to deal with—the client. I had to see to the crew. I had to order material. And made—to make sure that everything went as smoothly as possible or as good as possible.

Q: Did that superintendent position require more paperwork to be completed than the foreman position?

A: As time went by, yes, it did.

Q: Tell me about the additional paperwork.

A: Safety paperwork, you know, for say S-JSAs. Going to meetings, you know, right when a—when a person left, you know, you had to—you had write them a slip of—a

slip on about whether, you know, whether—what he was left or why he fired or it was—it was quite a bit of paperwork, you know, I can't remember every piece that we—that I've done.

Q: And did the paperwork take a considerable amount of time?

A: Yes, it did.

Q: Did you ever find yourself having difficulty getting all that paperwork done?

Object to form.

A: No, I didn't have no difficulty—I just had the timing. Sometime I had to take it home on the weekend to—to—to finish it and have it ready for Monday morning.

Q: Were you always able to turn in the paperwork on time?

A: Yes, sir.

Q: Did you ever have to seek out any assistance in doing that paperwork?

A: No.

((Doc. 76-7 at 59:2–60:2; 69:1–70:21.) The cited deposition testimony actually confirms Defendants' assertion that at times, Larry engaged in some supervisory duties. This testimony certainly does not create any dispute regarding Defendants' assertion that Larry had some supervisory duties. These are but a few examples that are illustrative of much of Plaintiffs' brief, where assertions of fact were made, but the citations to the evidentiary record in no way provided support for those assertions.

Plaintiffs also made misrepresentations in the evidentiary material submitted with their brief in opposition to summary judgment. Larry, Chester, and Freddie signed declarations under penalty of perjury, drafted by their attorneys, in which

they attested to certain facts, such as the fact that Larry was in a supervisory role at MSB. Some of the facts attested to in these declarations could not be reconciled with Larry, Chester, and Freddie's sworn deposition testimony, and thus the Court struck these assertions as stated in its Opinion. (*See* doc. 123 at 18–21.) For example, Chester stated in his deposition that he had been terminated once for failing a drug test. (Doc 76–9 at 20.) Yet, in his declaration opposing summary judgment, Chester swore that he "never received any discipline" while working for MSB. (Doc. 102–2 at 1.) Larry, in his deposition, stated that it was his personal choice to work alongside his crew. (Doc. 76–7 at 29.) Yet, in his declaration, Larry swore that he was "required" to work alongside his crew. (Doc. 102–1 at 1.) Freddie's declaration and deposition were also inconsistent. For instance, in his deposition, Freddie stated that the only person to whom he expressed an interest in being promoted was his brother, Larry. (Doc. 76–12 at 23–24.) Yet, in his declaration, Freddie swore that he was "denied job advances and promotions due to my race." (Doc. 102–3 at 3.) Despite these inconsistencies, the Court declined to strike the declarations in their entirety, and instead relied upon statements asserted by Plaintiffs which were consistent with their sworn deposition testimony. In ruling on summary judgment, the Court still gave careful consideration to all of Plaintiffs' claims and evidence, even though it was difficult to determine which portions of Plaintiffs' brief and evidentiary material

should be relied upon by the Court. And, upon pointing out the Court's disappointment with Plaintiffs' briefing, Plaintiffs responded that any errors were the fault of this Court for not granting sufficient extensions of time and enough additional pages for their response brief. (*See* doc. 132 at 39.)

At trial on Larry's FLSA claim, the Court expressed concerns with both Chester and Larry's testimony. Concerning Chester, both his sworn deposition testimony and declaration submitted at the dispositive motion stage conflicted with his testimony at trial. In his declaration, Chester attested that Larry was a superintendent who:

> did his own payroll, hired employees for the job and performed all the duties of a superintendent. He never asked to be promoted because he was in the highest job available other than a job in the office… Larry could perform all the duties on a job site as the highest level superintendent on site.

(Doc. 102-2 at 6 ¶ 21.) During his deposition, Chester similarly identified Larry as a superintendent that he worked under. Chester testified as follows:

> Q: Okay. What other superintendents did you work with besides Lee Dubberly?
> A: Let me think about it. It's hard for me to come up with some names because these guys I haven't seen them in a long time. Well, Larry, he was -- he was superintendent so he had some jobs and I worked with him.
> Q: Larry?
> A: Larry Coleman, my brother.
>
> …

> Q: All right. What -- what was your brother Larry's
> position at the time, let's say, 2017? Was he a foreman,
> superintendent or what?
> A: Well, as far as I'm concerned, he was still a
> superintendent. Because at the -- he was --he had -- you
> know, they put him over jobs before we went to the lake,
> and he was superintendent.

(Doc. 76-9 at 16:5–13, 87:8–14). During the trial, Chester's testimony was initially
that:

> Q: Who were your supervisors when you were working at
> Morris-Shea Bridge?
> A: Lee Dubberly – they had multiple supervisors that I
> worked under. Larry Coleman, my brother, he was in a
> supervisor position, he was a foreman. And that about it.

(Doc. 163-4 at 5.) However, Chester then testified that:

> Q: Did you ever see Larry performing supervisory or
> management activities?
> A: Very rarely. If anybody needed to learn something, he
> would show them. You know, we all did that. If one was
> performing a job and he wasn't doing it right, he would
> show him how to do it. So I guess that would be a part of
> supervisory work.
> Q: But the majority of the time when you were working
> with Larry was he performing manual labor with the crew
> or was he performing management or supervisory
> functions?
> A: Well, he always doing manual labor because he knew
> more about the job and he had to work -- a lot of time I was
> in the machine, you know, I couldn't be on the ground. So
> he did a lot of labor work.

(*Id.* at 6–7.)

On cross examination at trial, Defendants' counsel presented Chester with his declaration, in which he had attested that Larry was a superintendent. On redirect, Plaintiffs' counsel attempted to rehabilitate Chester, asking if Larry was a superintendent between 2015 and 2017. The following exchange occurred:

> Q: Was Larry a superintendent on any job where you were working with him during 2015 to 2017?
> A: I think that he had been like demoted from superintendent down to foreman.
> Q: Was Larry a superintendent on a job where you were working some time before 2015?
> A: Yeah, he have -- he have performed his own jobs.
> Q: Between 2015 and 2017 was Larry working as a superintendent or a foreman?
> A: I take it to be as a foreman.
> Q: When Larry was working as a superintendent, did he do his own payroll, hire employees and perform all duties of a superintendent?
> A: He did his own payroll, but we already had a crew, so he didn't hire anybody that I know of.

(*Id.* at 48.) Even if these statements could be reconciled with Chester's declaration, Plaintiffs' counsel led Chester to give a response that completely contradicted his sworn deposition testimony, where he stated that Larry was a superintendent when Chester worked with him from 2015 to 2017. This was important because in order to prevail on his FLSA claim, Larry could not be a supervisor.

Larry similarly had sworn statements submitted at summary judgment that conflicted with his testimony at trial. In his declaration, Larry swore as follows:

I ran my own job sites as a superintendent. I did my own payroll, hired employees for the job and performed all the duties of a superintendent. I never asked to be promoted because I was in the highest classification other than a job in the office. I was performing the duties of a superintendent without the pay.

(Doc. 102–1 at 8 ¶ 34.)

In his deposition, Larry again claimed to be a superintendent. Larry testified as follows:

> Q: What position do you think you were rehired on on September of 2014?
> A: As superintendent, because that's what I did when I went back. I went back to take over a job just like Sam Gardner did, just like Johnny Diemer did when he -- when he -- when he left, come back --he left and took a whole crew with him. Keith Pate, he come back to take over the job. David Turberville left, come back and took over a job. And they --they -- they – they put them back as a superintendent. When I went -- this document here, when I went to Maryland, I took over a job. So I don't know why they call me. They never even say --they never said that I was a salaried foreman because I didn't -- I did -- I did -- I run the job just like other superintendents ran they job.

(Doc. 76–7 at 309:23–310:1–15.) These representations are consistent with Larry's

representations on his SSA disability application, where he stated that he was a

superintendent who supervised ten workers for over eight hours a day. (Doc. 164-3 at 5, 10–11.)[1]

Yet when asked about his position at MSB at trial, Larry testified that he was not in a supervisory role. Larry testified as follows:

> Q: And what was your job title?
> A: 2015, I don't think I -- I don't think, actually, I had a title from the company. But I called myself, I called myself a superintendent, I called myself a foreman based on the years before, way back years before when I did foreman and superintendent work. But when I – I came back to Morris-Shea in 2015. And when I -- I went to Mr. Shea and I asked for my job back. And he did -- when he decided to hire me back, he told me I wasn't going to be no foreman, he was going to send me on that job as a pile driver up in Maryland, that's the job that I went on, first job I went on when I came back. So I didn't do no -- I didn't do no superintendent work other than with the crew, I worked with the crew when I went up there, because there was nobody in the crew that knew anything as far as piledriving. So I went and I did all the -- everything that it need to do. Except for the hiring, the firing, and the paperwork, and do that. I just -- I just got in the crew and went to work, you know.
>
> …
>
> Q: When you were working these different projects [after being rehired by Morris-Shea in 2014], and I'm looking at the sheet we have in front of the jury right now, Bates number 5083, were you supervising or doing other work?
> A: No, I was – I was in the mix with the – putting it all together. I wasn't supervising.

---

[1]     The Court notes that this portion of Larry's SSA disability application was not submitted by the parties for consideration at summary judgment. If it had been, then the Court's analysis regarding Larry's FLSA claim likely would have been different.

...

Q: Were those supervisory jobs that you were performing there?
A: That I was – no.
Q: What were you doing there?
A: The actual work.

...

Q: And do you see anywhere on special projects [Shea Lake and Richard Shea's house] where you were categorized or labeled as a superintendent, foreman or laborer?
A: No.
Q: When you were working at either Richard Shea's lot or the Shea lake, did you have a crew?
A: No, I didn't have a crew.

...

Q: Were you doing supervisory work at the Birmingham Thunderbolts?
A: No.
Q: Did you have a crew?
A:  No. It was a crew there, but I didn't have a crew.

...

Q: Did you have a crew on that job [Richard Shea's house]?
A: No, I didn't have -- Chester and Freddie was there, but it wasn't my crew.

...

Q: On any job you were doing, what was your primary job duty?
A: Didn't have one. I was all over the place from fixing hammers to moving piles to driving piles to looking over - - looking over the crew, made sure that they were doing

what they suppose to do. . . .

…

Q: Could you hire and fire from 2015 to 2017?
A: No.

…

Q: Do you believe you were misclassified as a salaried employee from 2015 to 2017 on some jobs at Morris-Shea.
A: Yes, I believe so.
Q: Why?
A: For the work that I did. You know, like I said, I don't know -- I believe when -- when it -- when it rain, I don't think the other superintendent was done like me or other foreman was done like me. When they, you know, when they said I was – when they say I was another foreman or a superintendent and then they say I wasn't nothing, you know, I didn't -- I really didn't think that I was in that rank with them, you know, as higher up management. Because when the job was being done, I got out there and I performed the job. And I don't know if they looked at me as upper management just because I was able to do it and I just went and did it. I didn't have to have no superintendent telling me what to do because of my thirty-five years of experience. But I wasn't paid like the rest of the superintendents. I wasn't treated like the rest of the superintendents because -- well, that's why I – that's the way I feel that I was misclassified.

(Doc. 163-4 at 82–83, 97–98, 105–107, 128–29, 133–34).

It appears that both Larry and Chester altered their testimony in this case regarding whether Larry was a supervisor to strengthen the argument that Larry was incorrectly classified as an exempt employee under the FLSA

The Court understands that parties often attempt to present facts in the light most favorable to their claims; however, they are not permitted to change the facts back and forth in an effort to survive judgment. Perhaps each incident outlined by the Court, standing alone, does not rise to the level of intentionally "playing fast and loose" with the Court. However, when viewed in the aggregate, Plaintiffs' actions support the conclusion that Chester and Larry are attempting to manipulate the judicial system as they see fit, without regard for the integrity of the system.

## II.   DISCUSSION

Judicial estoppel is an equitable doctrine intended "to protect the integrity of the judicial process." *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (quoting *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982)). Judicial estoppel is properly invoked when a party makes a "calculated assertion of divergent sworn positions [that makes] a mockery of justice." *McKinnon v. Blue Cross & Blue Shield*, 935 F.2d 1187, 1192 (11th Cir. 1991) (quoting *Am. Nat'l Bank v. FDIC*, 710 F.2d 1528, 1536 (11th Cir. 1983)). The Supreme Court suggested several "non-exclusive" factors to consider when determining whether to apply judicial estoppel, including that (1) "a party's later position must be 'clearly inconsistent' with its earlier position"; (2) a court adopted a party's position such that "judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either

the first or the second court was misled'"; and (3) "the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *New Hampshire*, 532 U.S. at 750–51 (acknowledging that there are "no inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel"). The Eleventh Circuit generally applies a two-factor test for judicial estoppel, examining whether (1) "allegedly inconsistent positions were made under oath in a prior proceeding"; and requiring that (2) "such inconsistencies must have been calculated to make a mockery of the judicial system." *Parker v. Wendy's Int'l Inc.*, 365 F.3d 1268, 1271 (11th Cir. 2004) (quoting *Burnes v. Pemco Aeroplex, Inc.*, 291 F.3d 1282, 1285 (11th Cir. 2002)); *see also Slater v. U.S. Steel Corp.*, 871 F.3d 1174, 1180–81 (11th Cir. 2017) (en banc).

Other circuits have applied the doctrine of judicial estoppel when parties adopt inconsistent positions within the same litigation. *See, e.g.*, *Chrysler Corp. v. Silva*, 118 F.3d 56, 59–60 & n.5 (1st Cir. 1997) (affirming the district court's dismissal of the defendant's counterclaim when he "repeatedly made judicial admissions negating his [counterclaim], and, thus, is estopped from raising said claim"); *Morganroth & Morganroth v. DeLorean*, 123 F.3d 374, 380–81 (6th Cir. 1997) ("A party cannot testify one way at trial and then reverse her factual contentions on

appeal in order to overcome an adverse evidentiary ruling.”); *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 716 (9th Cir. 1990) (“This circuit has recognized that the doctrine of judicial estoppel precludes parties from taking inconsistent positions in the same litigation . . . .” Furthermore, some courts “extend[] judicial estoppel in all cases where the offending party has played ‘fast and loose’ with the court, even if ultimately unsuccessful.” (citing *Patriot Cinemas,* 834 F.2d at 212)); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166 (4th Cir. 1982) (stating that “a party may properly be precluded as a matter of law from adopting a legal position in conflict with one earlier taken in the same or related litigation . . . to prevent the party from ‘playing fast and loose’ with the courts, and to protect the essential integrity of the judicial process”); *see also New Hampshire*, 532 U.S. at 749 (recognizing that judicial estoppel “generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase” (quoting *Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000)).[2]

---

[2] The Court notes that the Eleventh Circuit typically applies judicial estoppel when contrary representations are made in separate judicial proceedings that involve bankruptcy. But the underlying reasoning upon which the Eleventh Circuit relies is that “absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory.” *Slater*, 871 F.3d at 1181 (quoting *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996)). And, the Eleventh Circuit has not prohibited the application of judicial estoppel to a scenario in

Applying judicial estoppel is appropriate in this case as Plaintiffs took inconsistent positions to make a mockery of the judicial system. Throughout Plaintiffs' defense of summary judgment and motion to reconsider, Larry asserted that he was a superintendent at MSB. This Court accepted that position in its Memorandum of Opinion at the summary judgment stage. In that opinion, this Court wrote that:

> Larry provides a list of nine employees classified as foremen and fourteen employees classified as superintendents. A similarly situated comparator for Larry would have similar job responsibilities, similar licenses or certifications, and a similar employment history. Thus, a proper comparator would, at the very least, be either a foreman or superintendent who lacked an NCCCO or CIC license, and who had no other certifications from MSB.

(Doc. 123 at 33–34.) Therefore, this Court relied on the fact that someone with a supervisorial role would be the comparator for Larry. For the purposes of his discrimination claims, this Court failed to find a proper comparator existed because of the differences in licenses, not because of the supervisorial status. Further, in affidavits submitted at the summary judgment stage, both Larry and Chester claimed that Larry was a superintendent who ran his own crew and had the power to hire and fire. (Docs. 102-2 at 6; 102–1 at 8).

---

which parties seek to gain an advantage in the same litigation, such as is the case before the Court.

However, Larry and Chester have now represented, under oath at trial, that Larry was not a superintendent in an attempt to prevail on his FLSA claim. For instance, at trial Chester was asked whether he ever saw Larry performing supervisory activities to which he responded, "very rarely." (Doc. 163–4 at 6). Chester was later asked if Larry was a superintendent between 2015 and 2017, to which Chester replied, "I think that he had been like demoted from superintendent down to foreman." (*Id.* at 48). Plaintiffs' counsel then asked Chester whether "Larry was working as a superintendent or a foreman" between 2015 and 2017. (*Id.*) Chester replied, "I take it to be as a foreman." (*Id.*)

Larry was asked whether he could hire and fire himself from 2015 to 2017 to which he responded "[n]o." (*Id.* at 129.) Larry was also asked whether he was a supervisor in numerous projects such as the Shea Lake job, the Birmingham Thunderbolts job, the Shea house job, and the Maryland job. (*Id.* at 82–83, 97, 105, 106.) Larry each time responded that he was doing the actual work and not performing a supervisory role. (*Id.*)  Essentially, Larry's trial testimony is that between 2015 and 2017, he never hired his own crews or functioned in a supervisory capacity but did manual labor only. This position is in direct conflict with his submitted affidavit which says, "I ran my own job sites as a superintendent. I did my own payroll, hired employees for the job and performed all the duties of a

superintendent." (Doc. 102–1 at 8). It also conflicts with his deposition testimony in which he says that he was rehired for the Maryland job as a superintendent. (Doc. 76–7 at 309:23–310:1–15.)

The Eleventh Circuit has found that the mere amending of a complaint alone is not an inconsistency that warrants the application of judicial estoppel. *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 647 (11th Cir. 2019). In *Smith*, the district court applied judicial estoppel after Smith amended her complaint and changed her position as to when she became aware of an overtime claim against the defendants. *Id.* The district court applied judicial estoppel based on an inference from *Burnes* and *Barger v. City of Cartersville*, 348 F.3d 1289 (11th Cir. 2003). *Smith*, 940 F.3d at 647. At the time, *Burnes* and *Barger* permitted the inference that a party's taking of inconsistent positions meant that the party intended to manipulate the judicial system. *Id.* The Eleventh Circuit reversed the application of judicial estoppel and remanded that issue back to the district court because district courts are now required to "consider the totality of the facts and circumstances of the case to determine whether a plaintiff intended to make a mockery of the judicial system." *Id.* The Eleventh Circuit also noted in dicta that prior inconsistent statements are usually matters for impeachment that add to the adversarial process. *Id.* at 647–48.

However, Plaintiffs have not offered just a simple prior inconsistent statement but mountains of them. As explained above, Plaintiffs consistently misrepresented facts to gain an advantage in this litigation. When needed for the summary judgment stage, Larry was allegedly a supervisor, evidence this Court relied upon in deciding the motion for summary judgment. Then, when needed for trial, Larry was allegedly not a supervisor. This contradiction goes far beyond a prior inconsistent statement that can be used for impeachment. Instead, this is a blatant adulteration of the facts which was intended to and did mislead this Court at the summary judgment stage. *See New Hampshire*, 532 U.S. at 750–51. This testimony was presented despite multiple warnings by the Court at the time the testimony was being presented to the jury. The adversarial process is in no way benefitted by Plaintiffs being allowed to abuse the Court. Considering the totality of the facts and circumstances in this case, the Court concludes that Plaintiffs Chester and Larry intended to make a mockery of the judicial system. *See Smith*, 940 F.3d at 647.

Indeed, should Plaintiffs appeal this Court's grant of summary judgment on the discrimination claims (Doc. 124) and succeed, would they then inconceivably be allowed to present to a jury that Larry actually was a supervisor? Estoppel is appropriate at this juncture to prevent Plaintiffs from arguing on appeal that Larry was a superintendent for the purposes of their discrimination claims. The Court

recognizes that parties may pursue different and conflicting legal theories throughout litigation. However, what parties are not permitted to do is to change the evidence and facts of the case as it suits them to increase their chances of prevailing on a specific claim that was then under consideration, which appears to be what occurred in this case.

Plaintiffs' counsel retained counsel for themselves prior to responding to MSB's reply to the show cause order. The retained counsel wrote that:

> Plaintiff's claims that he performed the duties of a superintendent and that he was not exempt under the FLSA are not inherently contradictory. In fact, there is an entire genre of "working supervisor" cases in which supervisors have been found to be non-exempt because management – although among their duties – was not their "primary duty." *See, e.g., Morgan v. Family Dollar Stores*, 551 F.3d 1253 (11th Cir. 2008), *cert. denied*, 558 U.S. 816 (2009) (managers not exempt under the FLSA because manual labor was their "primary duty"); *Carr v. Autozoner*, LLC, 2020 U.S. Dist. LEXIS 72742 (N.D. Ala. 2020) (store managers not exempt under FLSA because non-managerial tasks were their primary duty).

(Doc. 176 at 4.) To be clear, Plaintiffs' counsel was certainly free to argue that Larry was a working supervisor or that his primary duties weren't managerial. However, what they are not permitted to do is change the facts to suit their needs. In the declaration submitted in opposition to summary judgment, Larry testified that, "I ran my own job sites as a superintendent. I did my own payroll, hired employees for the job and performed all the duties of a superintendent." (Doc. 102–1 at 8). Yet, at

trial, Larry was asked whether he himself could hire and fire from 2015 to 2017 to which he responded "[n]o." (Doc. 163–4 at 129.) As mentioned above, Larry's trial testimony was that between 2015 and 2017, he never hired his own crews or functioned in a supervisory capacity (*Id.* at 82–83, 97, 105, 106.) It appears that Larry completely changed his testimony in an attempt to mislead this Court and the jury to succeed on his FLSA claim.

In sum, it is inappropriate that Plaintiffs Larry and Chester represented the facts one way at summary judgment and, when they lost that argument, altered the facts and evidence in an effort to succeed on a different claim at trial. The Plaintiffs' position at summary judgment, that Larry was a supervisor, or superintendent who performed all the duties of such a position, was clearly inconsistent with Larry's claim for relief under the FLSA. This Court noticed the inconsistency when considering Defendants' motion for summary judgment. However, Defendants did not sufficiently present the FLSA issue for the Court to grant a judgment on this claim at the dispositive motion stage. While this Court wondered how Plaintiffs would survive a motion for judgment as a matter of law during the trial, it was

shocked when it became apparent that the witnesses would simply change their testimony. This cannot be permitted.

## III.   CONCLUSION

For the reasons discussed above, judicial estoppel is due to be applied to Larry and Chester's claims.[3] Accordingly, in addition to the grant of summary judgment on Counts II–XXII (Doc. 124), Larry and Chester's claims[4] are also due to be DISMISSED WITH PREJUDICE based upon judicial estoppel. Due to the jury verdict and the application of judicial estoppel, Larry's FLSA claim, Count I, is due to be DISMISSED WITH PREJUDICE. An Order consistent with this Memorandum of Opinion will be entered contemporaneously herewith.

**DONE** and **ORDERED** on September 27, 2021.

L. Scott Coogler
United States District Judge

206770

---

[3] The Court chooses not to apply judicial estoppel to Freddie's claims as he did not testify. Accordingly, the grant of summary judgment as to his claims does not change.

[4] Chester's deposition and declarations were clearly inconsistent, warranting the application of judicial estoppel as another reason to dismiss all of his clams with prejudice. In addition, his testimony at Larry's trial on the FLSA claim also demonstrates that judicial estoppel should apply. At trial, Chester changed his testimony in an attempt to perpetuate fraud upon the Court with regard to Larry's claim. It would be inappropriate for Chester to participate in a scheme to defraud this Court and then be allowed to continue in litigation with the court he intentionally misled.